### THE STEAMER SYRACUSE.

1. A steamer having a very large tow, and approaching a place where, from the number of vessels in the water, and the force of counter currents, navigation with such a tow is apt to be dangerous, but with a small one is less so—a place, for example, like that near the Battery, New York, where the East River and the Hudson meet—is bound to proceed with great care, and if within two or three miles of the place, though not nearer, she can divide her tow, she is bound to divide it.

2. Though a libel in admiralty alleging an admitted collision may not allege the specific sort of negligence by which the collision was brought about, but on the contrary allege facts not shown, yet where the true cause of the collision is disclosed by the respondent's witnesses, so that the respondent cannot allege surprise, this court, if it can see that the omission to state the true cause was without any design, will not allow it to work injury to the libellant; and though the libellant ought in such a case to have amended his libel below, will extract the real case from the whole record, and decide accordingly.

APPEAL from the Circuit Court for the Southern District of New York.

This appeal originated in a libel in the Admiralty by the owner of the canal-boat Eldridge, against the steamer Syracuse, to recover the damages occasioned to her by her running into a vessel at anchor in the harbor of New York, the canal-boat being at the time in tow of the Syracuse.

The canal-boat was taken in tow at Albany, to be towed to New York; the Syracuse having at the time a tow of forty boats; a tow, however, testified to have been "an ordinary tow for the Syracuse, which on one occasion had taken fifty-two boats." The Eldridge, which had applied for towage after the tow was pretty much made up, was toward the rear end of it, and liable of course to be well swung round in any sweep of the steamer.

Approaching New York, and getting within a mile or so of the Battery, that part of the harbor was seen to be somewhat unusually full of vessels, but to the view of the captain there *seemed* to be one passage or "gangway," through which the tow could be taken. Another steamer, the Cayuga, with a similar tow had, as he supposed, though, perhaps, incor-

rectly, passed through it safely not long before. The Syra-, cuse accordingly went on. The tide at the time was ebb, setting south in the North River, but above Governor's Island setting sharply to the west and southwest, as it came out of the East River.

The peculiarity of the position lay of course in this, that the tow coming down the North River, had the tide with her, but as she turned into the East River had to meet an ebb tide coming from the East River nearly at right angles, while many vessels were lying at anchor all around. Of necessity the rear end of a long tow would be swept well round.

As soon as the Syracuse passed the last vessel on her port side, she turned up into the East River. It was desirable to head up the East River as speedily as possible in order to check the effects of the East River tide upon the boats. She had previously taken on two small steamtugs as helpers, and in addition to the starboarding of her own wheel the helper on the port side was stopped, while the other one was kept in motion, to assist the turn. But notwithstanding all efforts, the boats at the end of the hawser were swept over by the East River tide, which struck them on their sides, and were carried towards a brig which lay at anchor on the starboard side, and which also took a sheer towards them. The canalboat struck the brig's stem and shortly after sunk.

The libel charged that the collision was occasioned by the carelessness and negligence of those in charge of the steamboat in not giving the brig lying at anchor a wide berth, which, as the libel alleged, she might have done, there being plenty of room between the Battery and the brig for the Syracuse to have passed with her tow.

The libel also charged that the collision was caused by the negligence, want of skill and of prudent management *generally* on the part of the steamboat. But it did not charge negligence in not stopping before reaching the Battery, and dividing the tow.

The answer did not in any respect deny the allegations of the libel above set forth as to the steamboats *having abun-*

*dance of room to make the passage round the Battery.* The grounds upon which it sought to exculpate the steamer were:

1st. That by special agreement between the canal-boat and the steamboat, the former was being towed *at her own risk.*

2d. By the negligence of those in charge of the canal-boat, to cast off lines, or use their helm, or do anything to prevent the collision.

3d. That the collision was *inevitable*, having been caused by an *unusually* strong ebb tide, which swept the canal-boat against the bows of the brig lying at anchor as the towboat was rounding the Battery with her tow.

The canal-boat was shown to have committed no fault. This was admitted in the argument here. The receipt for the towage—a printed form—was for towing her " at the risk of her master and owner;" but it seemed that the canal-boat had been made fast, the tow put in motion, and the towage charge paid before this receipt was delivered. What the contract was, was therefore a matter disputed.

As to the tide setting in from the East River, although the captain of the steamer testified that it was *unusually* strong, nothing unusual about it was otherwise well proved. Nothing out of the usual and regular order of nature was attempted to be shown, nor any preceding violence of the winds, which sometimes forces the waters from the sea into the inlets when they retire with greater force on the ebb. Neither had it occurred, apparently, to those in charge of the steamer, until the place of the disaster was nearly reached, that the tide was stronger than the usually strong tide at that place. The almanac, for December 1st, 1861, showed that it was a low course of tides at that time, the moon not becoming full until December 17th.

It appeared, by cross-examination of the master of the steamer, that there was always considerable danger in taking a tow so large as the one which he had on this occasion round the Battery, when there was a strong ebb tide from the East River, if the place was crowded by numerous vessels at anchor, as it commonly was. That on this occasion,

however, he thought he saw a clear gangway, and felt no alarm until he had got too far into it to stop with so large a tow, though he could have stopped with a small tow; that he could have stopped with the tow he had, above Thirteenth Street, about two miles above, where there is room and the tide has a different set; and could have there held or divided his tow; that in the night-time he had for caution stopped there and left his tow until morning; that such stoppage was made not unfrequently in the night-time, and could be made as well in the daytime as the night; that he had seen persons stop there, and, when the tow was large, divide their tow; though he had never divided his own tow.

The pilot on cross-examination testified that above Thirteenth Street they could have stopped the tow, but not lower down; that he did not see that the water about the Battery was crowded with vessels until he got lower down, say within a mile or so of the Battery; that at Thirteenth Street it did not appear to be more crowded than usual, nor, at that point, but what they might go through the same as usual; that there are generally a good many vessels off the Battery, and that he never went through a gangway there but that he saw " more or less danger."

The District Court condemned the steamer, and the Circuit Court having affirmed the decree, her owners brought the case here.

*Mr. R. D. Benedict, for the appellant:*

I. The boat was towed, " at the risk of her master and owners," that is to say, under a contract on the part of the libellant that he would bear the risks of the navigation, provided the steamboat which furnished the propulsive power was navigated with ordinary care and skill. Any other construction of the rights of the parties would deprive that clause of the contract of meaning and make it a snare.

II. The libellant's case is made in this court to rest chiefly on the fact that the tow was not divided on arriving at Thirteenth Street and sent round piecemeal.

The answer is brief:

. 1st. The libel makes no charge of negligence antecedent to the coming to the Battery. It is variance to let in proof of an allegation not made, and a surprise on us to bring forward such an allegation now.

2d. There was no call for such extraordinary proceeding. No human being could tell on arriving at Thirteenth Street, full two miles above, that there was not room to pass through the vessels at anchor below in safety; and unless that could be told, the steamer was in no wise called upon to do so extraordinary a thing as to divide the tow. It needed but a few feet more width of channel to have saved all danger. To hold that the human eye is called upon to estimate, within a few feet, the width of such a passage at the distance of two miles, and to hold that a failure in the correctness of such an estimate is a failure to use ordinary care, would be unreasonable. If the officers of the Syracuse formed the best judgment which was possible to be attained, there was no negligence on their part in acting upon that judgment.

*Mr. J. C. Carter*, contra.

Mr. Justice DAVIS delivered the opinion of the court.

It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that, by special agreement, the canal-boat was being towed at her own risk, nevertheless, the steamer is liable, if, through the negligence of those in charge of her, the canal-boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences. It is admitted in the argument, and proved by the evidence, that the canal-boat was not to blame, and the inquiry, therefore, is, was the steamer equally without fault?

It frequently happens in cases of collision that the master of the vessel could not have prevented the accident at the moment it occurred, but this will not excuse him, if, by timely measures of precaution, the danger could have been avoided. Testing the present case by this rule there is no difficulty in determining by whose fault this collision occurred. It may be true, that the master of the Syracuse, after he got his boat off the Battery with her tow, in making the turn to go up the East River, was unable to keep the canal-boat from striking against the brig, but the question arises, ought he to have encountered this peril?

Manifestly not, under the proof furnished by the officers of the Syracuse themselves. In the state of case disclosed by the master and pilot, is it not plain that ordinary prudence required the master to stop where he was able to hold his tow, long enough to ascertain the state of things at the Battery? The master tells us that in the night-time, as a measure of precaution, he had stopped some distance above that place, and left his tow there until morning. If this precaution was necessary at night, why not in daylight; as the ebb tide was very strong, and the danger, therefore, imminent? It is no valid excuse for proceeding down the river, that, when off Thirteenth Street, it was impossible to know the width of the gangway through which the vessels must pass to get into' the East River, because it was easy to tell, even at that distance, that the river at the Battery was full of vessels, and, therefore, in the state of the tide, dangerous to navigate with such a fleet of boats. In view of the magnitude of the tow, the admitted danger of handling it in a strong ebb tide where there is a large amount of shipping, and the ability to stop where the tow could be managed, it was, to use the mildest term, negligence to make the attempt to pass the Battery into the East River. As the master could have stopped anywhere above Thirteenth Street, it was his duty, under the circumstances, to have done so, and either to have divided his tow, or remain there until the tide had slacked. If companies engaged in the business of towing, will, through greed of gain, undertake to transport from

Albany to New York, more canal-boats in one tow than can be safely handled in the waters of New York, they must see that the large amount of property intrusted to their care is not placed in jeopardy, through the want of preliminary caution and foresight on the part of the officers of their steamers.

It is objected that the libel does not specifically charge this antecedent negligence as a fault. This is true, and the libel is defective on that account, but in admiralty an omission to state some facts which prove to be material, but which cannot have occasioned any surprise to the opposite party, will not be allowed to work any injury to the libellant, if the court can see there was no design on his part in omitting to state them.* There is no doctrine of mere technical variance in the admiralty, and subject to the rule above stated, it is the duty of the court to extract the real case from the whole record, and decide accordingly. It is very clear that the libellant had no design in view in omitting to state the failure to stop as a fault, and equally clear, that the proof on that subject, coming, as it did, from the opposite party, could not have operated to surprise them.

JUDGMENT AFFIRMED.

---

* The Quickstep, 9 Wallace, 670; The Clement, 2 Curtis, 363.