### ALASKA COMMERCIAL CO. v. WILLIAMS.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1904.)

No. 963.

1. AMENDMENT OF PLEADINGS—DISCRETION OF COURT—AMENDMENT CHANGING ISSUES.

It was within the discretion of a trial court to refuse to permit the filing of an amended answer which sets up a new defense materially changing the issues, and which was not offered until after plaintiff had rested, and defendant had occupied two days in introducing evidence.

2. TOWAGE—DUTY OF TOWING VESSEL—LIMITATION OF LIABILITY BY CONTRACT.

A towing vessel cannot relieve itself by contract from liability for the failure to exercise reasonable care and skill in the performance of the service and for the safety of the tow.

3. SAME—ABANDONMENT OF TOW.

A steamer contracted to carry men and freight for a mining company from Juneau to Lituya Bay, in Alaska, and also to tow a small schooner belonging to the company and used as a lighter. The entrance to the bay is narrow, and can only be passed safely at slack tide. Arriving off the entrance the master deemed it unsafe to enter at that time, and, the manager of the company on board refusing to consent that the men and stores should be loaded on the schooner and left outside, he proceeded with the tow up the coast. On the way the hawser parted, but the steamer proceeded without stopping, leaving the schooner adrift in the open sea, with five men on board, none of whom were acquainted with the coast. She was never seen afterwards, and all that was ever known of the fate of the men on board was the finding of the body of one on the beach. *Held*, that the obligation of reasonable care on the part of the steamer continued after leaving the bay, and that nothing in the towing contract would relieve her from liability for the abandonment of the tow, there being nothing in the situation which made such abandonment necessary.

4. WRONGFUL DEATH—JURISDICTION—ABANDONMENT OF TOW AT SEA WITHIN THREE-MILE LIMIT.

A steamer abandoned a small schooner which she had in tow on the parting of the tow line off the coast of Alaska at a point where the coast was dangerous, leaving five men on board, who were not competent to handle the vessel, nor having equipment for her navigation. Neither the schooner nor the men on board were seen again, with the exception of one, whose body was found on the beach. In an action against the owners of

¶ 1. See Pleading, vol. 39, Cent. Dig. §§ 601, 773.

the steamer to recover damages for the death of one of the men under the Alaska statute, the jury returned a special finding that when the schooner was last seen from the steamer both vessels were within three miles of land, and they also found, on evidence which justified such finding, that decedent came to his death within such limit, and before the following morning. *Held* that, although the vessels may have been outside the three-mile limit when the line parted, the duty of the steamer to return to the rescue of the schooner, the failure to perform which was the proximate cause of her loss with those on board, continued, and that an instruction that if the jury found such facts, and that the death resulted from the failure of the steamer to perform such duty, the plaintiff was entitled to recover, was correct.

In Error to the District Court of the United States for Division No. 1 of the District of Alaska.

On April 12, 1900, the Alaska Commercial Company, the plaintiff in error, was the owner of the steamer Bertha, a vessel of about 1,000 tons burden, then plying between Seattle, Juneau, Sitka, and other Alaskan ports. The Lituya Bay Gold Mining Company was a corporation engaged in placer mining at or near Lituya Bay, a bay having no port, and rarely visited, situated on the Alaskan coast about 130 miles northwest from Sitka, and 40 miles from Cross Sound. The mining company had its men, freight, and supplies at Juneau, and had there a schooner called the Dora B., of about 15 tons burden. The steamer Bertha being then at Juneau, on her regular trip to the westward, Charles Plaut, the manager of the mining company, entered into a contract with Captain Johansen, the master of the Bertha, to take his men and freight and to tow his schooner to Lituya Bay. The schooner was equipped with sails and rigging, but the sails were stowed in the hold, and had never been reefed. The schooner was intended to be used for lighterage purposes in Lituya Bay. Five of the men of the mining company were placed on the schooner by the manager. The remainder, together with the freight, were carried on the Bertha. The steamer, with the schooner in tow, proceeded from Juneau, on her regular course westward, through the inland waters, towards Sitka. On the evening of April 14th she arrived at Sitka. From Sitka she proceeded on her way to Lituya Bay through the open waters of the Pacific Ocean, in a northwesterly direction, along the coast. She arrived with her tow off the entrance to Lituya Bay at about 6 o'clock on the morning of April 15th. The entrance to the bay lies through a narrow channel, about 300 feet wide, inclosed by rocks on either side. The evidence is that it is a dangerous entrance except at slack tide, as at other times the breakers extend across the entrance, and the tide runs with a strong current. Upon arriving at the entrance to the bay the captain of the Bertha made a careful examination thereof, and concluded that it would not be safe at that time to attempt the entrance. He sent for Mr. Plaut, told him of the difficulty, and advised him to have the schooner hauled up alongside the ship, and to have the remaining members of his party and the freight which were on the Bertha placed on the schooner, and to sail the schooner into the bay under her own sails. Mr. Plaut was unwilling to do this. There is evidence that the captain then suggested that he might land his men and freight with small boats from a small cove outside the bay, and that this offer was also declined. The Bertha remained more than an hour at the entrance of the bay, and at the end of that time her master decided to go on to Yakutat, which is the next harbor up the coast, and about 80 miles distant to the westward. Yakutat was one of the regular ports at which the Bertha stopped on her westward and on her return voyage. It was stated by the captain of the Bertha and by another witness that Plaut consented to the continuance of the voyage, and stated that as soon as the weather moderated he would sail back to Lituya Bay. The Bertha, with the schooner in tow, proceeded on her course nearly directly west and off shore, and about 10 minutes after 12 o'clock, when opposite an indentation called Dry Bay, the towline parted, and left the schooner adrift. There is conflict of the testimony as to the distance from the vessels to the shore at that time. Some of the witnesses estimated the distance to have been as great as 10

miles, others estimated it at less than 3 miles. The steamer made no effort to pick up the tow, but proceeded on her way under full steam, with sails set, and without stopping or slowing down. The men on the schooner ran up a bowsprit or small jib sail. There was a strong wind, blowing from the southeast. The schooner, sailing with her jib sail, followed the steamer, and remained in sight about two hours. The Bertha continued on her way to Yakutat, where she arrived about half past 3 or a little later that afternoon. The schooner was never seen afterwards, except that it was shown that the hull of a wrecked schooner about the size of the Dora B. was seen on the shore of Alaska near Dry Bay, nor was there any evidence of the fate of the men on board, except that the body of one of them was found a week afterwards on the beach between Dry Bay and Yakutat. The defendant in error, who was one of the men of the mining party carried on 'the Bertha, was by the probate court of Juneau, Alaska, subsequently appointed administrator of the estates of the men who were lost on the schooner. He was appointed administrator of the estate of the decedent W. D. Baldwin upon the request of the decedent's father, who was next of kin. On March 22, 1902, he commenced the present action in the United States District Court, Division No. 1, for the district of Alaska, claiming damages in the sum of $5,000 for the death of Baldwin, under the provisions of section 353 of the procedure act of Alaska (Act June 6, 1900, c. 786, 31 Stat. 392). The complaint alleged that prior to the departure of the steamer Bertha from Juneau the mining company, for a valuable consideration, entered into a contract and agreement with the plaintiff in error, whereby the latter agreed to transport a considerable amount of freight on board its steamer Bertha, likewise a number of passengers, and to land the same in Lituya Bay, near and in front of the houses and headquarters of the mining company upon said bay, and to deliver said freight and passengers to said company at said point, and further agreed to tow and transport the schooner Dora B. upon the same trip, and bring her into Lituya Bay, and drop her near and in front of the buildings and headquarters of said mining company, and further agreed to transport upon the said schooner the decedent and four other employés of the mining company. The case was tried before a jury, who returned a verdict for the defendant in error for the sum of $5,000, and thereupon judgment was rendered. To review that judgment this writ of error was sued out.

Chickering & Gregory, A. K. Delaney, A. Heynemann, and Andros & Hengstler, for plaintiff in error.

Lewis P. Shackleford, John R. Winn, Jno. A. Shackleford, and Piles, Donworth & Howe, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is contended by the plaintiff in error that the court erred in denying its application to so amend its answer as to set forth the terms of the towage contract. The original answer made no affirmative allegation as to the contract, but contained a general denial of all of the facts alleged in the complaint as to the terms of the contract and the breach thereof. The case went to trial more than six months after the issues were made up. On the trial the defendant in error took all of his evidence and rested. The plaintiff in error, after occupying two days in introducing evidence for the defense, submitted to the court the proposed amendment to its answer. The amendment was not verified, nor was it accompanied by an affidavit. It set up as an affirmative defense what the plaintiff in error asserted to be the terms of the towage contract. It stated, in substance, that the owner of the schooner agreed to

properly man and equip her, and to put her in a seaworthy condition, and to ship thereon a crew of seamen, who could handle her in case of emergency, or in case it should be deemed dangerous or impracticable for the said Bertha to tow the schooner into Lituya Bay; that upon arriving at Lituya Bay the condition of the weather and the tide and sea were such as to make it hazardous for the steamer to enter, and that the manager of the mining company then agreed with the captain of the Bertha that he could proceed with the tow to Yakutat; that one of the conditions connected with the towing of the said schooner would be and that it was agreed and understood that in case of any emergency the said schooner should take care of itself by its crew and sailing apparel and tackle as aforesaid. The amendment proceeded to set up the defense of contributory negligence, alleging that the parting of the towline was due to the contributory negligence of the men on board the schooner in not properly parceling the hawser. The court denied the application on the ground that the proposed amendment radically changed the issues as already made, and substantially changed the cause of the defense. The introduction of the defense of contributory negligence, which had not been embraced in the original answer, radically changed the issues as made, and substantially changed the defense. It was in the discretion of the court to allow or deny this amendment, and in denying it we cannot say that there was abuse of its discretion. It is immaterial what reason the court gave for denying the application. There was no offer of an amendment setting forth only the terms of the contract as the plaintiff in error claimed it to be. If such an amendment had been proposed, there would have been no error in its rejection, for it would have been immaterial and unnecessary. The plaintiff in error had the right, under its general denial, to prove that the contract was otherwise than as alleged in the complaint, and in order to do so was free to introduce evidence to show what the contract really was. 1 American & English Encycl. of Pleading & Practice, 818; Marsh v. Dodge, 66 N. Y. 533; Burley v. German-American Bank, 111 U. S. 216, 4 Sup. Ct. 341, 28 L. Ed. 406.

It is contended, however, and this is the subject of one of the assignments of error, that the court in ruling upon the evidence which was offered by the plaintiff in error had excluded its proffered testimony to show that the terms of the contract were other than as alleged in the complaint. This contention is not sustained by the record. Mr. Plaut, the manager of the mining company, had testified that the contract was one by which the plaintiff in error was to tow the Dora B. to Lituya Bay for a stated compensation. The captain of the Bertha, while testifying on behalf of the plaintiff in error as to his action in departing from Lituya Bay without entering it, was asked the question: "What conclusion did you reach under those conditions in regard to going in?" He answered that he had made up his mind that it was not safe to go in, to take the Bertha in, and added: "I didn't wish to endanger my contract with the company, as it was always the understanding—" Here he was interrupted by counsel for defendant in error, who moved to strike out the latter part of the answer as "voluntary and not responsive." The motion was sustained by the court. Subsequently the same witness was asked to state his reasons for not

slacking up and coming back to the schooner after the towline parted. This was objected to as incompetent, irrelevant, and immaterial. The objection was sustained. The witness was then asked the following question: "Q. In your judgment, taking everything into consideration, as matters were at that time, and you speaking now as a seaman, what did you consider best for you to do, both for yourself and the Dora B., after the latter went adrift? A. Well, there was no other way that I could see than to go on the way I did, because, so far as the schooner was concerned, she was perfectly safe, and if I had thought in any way that she wasn't I would have acted different." It is urged that the court in ruling upon the objections to these questions excluded evidence which the witness was about to give of the terms of the contract, and it is said that in the terms of that contract, as he would have stated them, were to be found the reasons why he did not enter Lituya Bay, and why he did not go back or slack up when the towline parted. To this it is sufficient to say that it was not suggested to the trial court that any such evidence was sought to be elicited from the witness, nor was there anything in the questions as they were propounded to advise the court that such was the case. On the contrary, when the witness did, in response to the last question above quoted, state his reasons for his conduct, there was no intimation in his answer that he relied on the terms of the towage contract as excusing him for not returning to pick up the tow. It would seem, moreover, that the "contract with the company" referred to in response to the first question was not the contract he made with Plaut, but the contract that existed between the witness and his employer, the plaintiff in error, which he feared would be endangered by his entering Lituya Bay under the conditions then existing. How was it possible to endanger the alleged contract which was set up in the proposed amendment by taking the schooner into Lituya Bay at the request of her owner?

But we are of the opinion that if the plaintiff in error had proved the contract to be as in the proposed amendment it was alleged to be, it would not have afforded it exemption from liability in the present case. In the Steamer Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, Mr. Justice Davis said:

"It is unnecessary to consider the evidence relating to the alleged contract of towage, because if it be true, as the appellant says, that, by special agreement, the steamer is liable, if through the negligence of those in charge of her, the canal boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences."

Of similar import are In re Moran (D. C.) 120 Fed. 556; The Somers N. Smith (D. C.) 120 Fed. 569; The M. J. Cummings (D. C.) 18 Fed. 178; The Jonty Jenks (D. C.) 54 Fed. 1021.

The contract as set forth in the proposed amendment to the answer related only to the towage from Juneau to Lituya Bay. If it was made as alleged, it afforded no excuse for the conduct of the master of the Bertha in leaving the schooner adrift as he did. His conduct in so doing was not the exercise of reasonable care and maritime skill in conducting the towage service. He admitted that he had no knowl-

edge whether the schooner had on board compass, chart, or other things necessary for navigation. It is not denied that at the time when the towline parted Plaut protested against his leaving the schooner, and told him that the men on board of her were not prepared to navigate her without the aid of any one who knew the coast.

It is contended that the court erred in charging the jury that the contract, which was a contract to tow the schooner Dora B. from Juneau to Lituya Bay, required the steamer to take the tow into the bay, and leave her there, and it is argued that, considering the nature of the bay and the hazardous entrance thereto, such a construction of the contract was. erroneous, and that the Bertha had fulfilled her obligation when she reached the mouth of the bay. We think the court properly ruled otherwise, and that the construction placed upon the contract was the construction adopted by the parties thereto. The Bertha had on board nine of the members of the mining company's party and its freight. The captain of the Bertha evidently understood that he was to enter the bay. He testified: "I always made a practice to figure on that tide, because the only way we could enter the bay was slack water, either low or high, and I did so this time." He testified also that it was his custom to arrange the time of his arrival there in order to meet slack water if possible. He testified further: "I had two things, that was either to go in or to go on my course to the westward." It was shown that on the return voyage of the same trip the Bertha entered Lituya Bay, and landed there the mining company's men and freight, and that in June of the same year she again entered it, and that the captain of the Bertha, while in command of another steamer, had entered it in the year 1898 and again in 1899. But whatever may have been the true construction of the contract, the question becomes immaterial in view of the subsequent conduct of the Bertha in departing from the entrance to Lituya Bay with her tow on her way to Yakutat. Her obligation to exercise due care and to take the schooner to her destination remained the same as it was before.

It is earnestly insisted that the court erred in giving to the jury the following instruction:

"The obligation of a towing vessel to a tow is a continuing obligation, and if the jury find from the weight of the evidence that, after said towline parted, the schooner Dora B., with the decedent aboard, even if said towline parted outside of the district of Alaska, or beyond the marine limit of three miles, drifted within said three-mile limit, and that the decedent met the cause of his death within three miles of the shore of the district of Alaska, and that said death could have been avoided by the steamer Bertha and its master, had said master used that degree of skill and caution which prudent navigators usually employ in standing by, aiding, and succoring said schooner and the decedent while within said three-mile limit from shore, and that said decedent met his death by reason of such failure on the part of the master of the steamer Bertha, then you should find for the plaintiff in this case."

It is argued that by this instruction the jury were told that from the time when the towline parted until the death of the decedent there was at each instant of time, and at each point in space, a new wrong committed and a new right created; that is, that the tort was continued, and that the corresponding right continued, and that if the schooner had drifted for instance across the Pacific Ocean, and had subsequently at any time returned within the three-mile limit from the

Alaskan shore, and the decedent had there died, there would have been a cause of action. This argument ignores the salient facts in the case. The jury, in answer to interrogatories propounded by the plaintiff in error, returned several special verdicts, one of which was that the Dora B. was lost on her trip from Lituya Bay to Yakutat, on April 15, 1900. By another special verdict, the jury found that within the two hours during which the schooner was visible from the steamer after the towline had parted both the steamer and the schooner were less than three miles from the land. The evidence was that at the time when the schooner went adrift a strong wind was blowing, and the weather was squally, with mist and snow. There was no evidence that the schooner was equipped with compass or chart, or that more than one of the men on board of her was a sailor, or knew anything about handling a sailing vessel. The schooner had up only her small jib sail, and the evidence was that her other sails were stowed in the hold, and were not rigged for present use. The wind was quartering on her port stern, and the sea was running in obliquely toward the land. The result was a tendency to drift the schooner to the shore. About 3:45 in the afternoon the wind changed to the southwest, so as to send her directly toward the beach. It is the undisputed evidence that between Lituya Bay and Yakutat it is a dangerous sea. Captain Hansen, a witness for the plaintiff in error, testified that he would consider it dangerous to leave any vessel along that coast with a tow, and that good seamanship would require such a vessel in charge of a tow to make the nearest port, which would be Yakutat, with as great haste as possible. The coast survey chart in evidence shows that a continuous range of high mountains, some as high as 16,000 feet, extends along the coast from Lituya Bay to a point back of Yakutat, and it is in evidence that these mountains, covered with snows and glaciers, create uncertain weather and dangerous conditions to navigation along the coast. In view of all these circumstances, it cannot be said that the duty of the steamer in the premises ended with the parting of the towline. Having failed to tow the schooner into the bay, and having started out to take her to Yakutat, it was her duty to complete the voyage to the latter place, unless prevented by circumstances beyond her control. When the towline parted it was her plain duty to return to the rescue of the schooner and take her again in tow. Such undoubtedly continued to be her duty during the two hours in which the schooner was in sight, and while, as the jury found, she was within the three-mile limit from the shore, and such was still her duty thereafter. For how long a time that duty continued it is unnecessary to determine. It certainly existed during that day and so long thereafter as the schooner continued to drift toward the shore, or to proceed on her course toward Yakutat, and so long as the Bertha could have returned and rescued her. Before the morning of the next day she had doubtless been wrecked, and the jury so found. Early on that morning, when the steamer came out from Yakutat Bay and passed Ocean Cape, the point where, according to the testimony of Captain Lennan, pilot of the Bertha, the schooner should have arrived if she had outlived the night, she was nowhere in sight. There was no error, therefore, in the instruction given to the jury, for there was a breach of the steamer's duty com-

mitted within the territory of Alaska. It was not the parting of the towline that caused the decedent's death. It was the continuing failure of the Bertha to come to the relief of the schooner before she was wrecked on the Alaskan shore.

We find no error for which the judgment should be reversed. The judgment is affirmed.