COTTON et al. v. ALMY.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1905.)

No. 1,171.

1. SHIPPING—LIABILITY OF LESSEE FOR LOSS OF VESSEL—NEGLIGENCE OR WANT OF SKILL—VOLUNTARY SERVICE.
   Where the lessees of a houseboat at the termination of the lease undertook to deliver it to the owner at a port other than that named in the lease and where the boat then was, although at the owner's request and without charge, they remained liable until its delivery for any injury to the same through their negligence or failure to exercise such maritime skill and care in towing from one port to the other as was reasonable under the conditions and circumstances existing at the time.

2. TOWAGE—NEGLIGENCE—EVIDENCE CONSIDERED.
   Evidence considered, and held to support a finding of negligence in undertaking to tow a houseboat from one port to another at the time and under the conditions shown, as well as in the manner of making up

the tow, which was by placing the boat between the tug and two loaded scows, all being towed tandem, subjecting it to a severe and unnecessary strain.

3. SHIPPING—LEASE OF VESSEL—DAMAGES FOR INJURY.

The rule, applied in marine insurance, that the injury of a vessel to such extent that the cost of repair would exceed half her value constitutes a total loss, is not applicable to the case of the injury of a vessel under lease, so as to entitle the owner to recover her full value as stipulated in the lease in the event of total loss, at least where there was no abandonment to the lessees.

Appeal from the District Court of the United States for the District of Hawaii.

Albert F. Judd, R. W. Breckons, and William R. Davis, for appellants.

J. J. Dunne and W. S. Burnett, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was a libel in personam brought against the libelees as copartners doing business under the firm name of Cotton Bros. & Co., in which was alleged, among other things, that during the times mentioned in the libel, and up to the 4th day of August, 1903, the libelant was the owner of a certain houseboat of the value of $2,500, then lying in the waters of Pearl Harbor, Oahu, which, on the 1st day of January, 1903, she leased to the libelees, together with the furniture contained therein, for the term of six months from that date, "with the privilege of an extension thereof from month to month, said extension not to exceed three months," at the rate of $75 per month, which rental the lessees covenanted to pay, and further covenanted that they would not remove the houseboat from the limits of Pearl Harbor; that they would provide proper moorings therefor, and would be liable for all damages to the houseboat from stranding or wrecking; and that, in case of the total loss of the houseboat, the lessees would pay to the lessors the sum of ,$2,500, and, at the end of the term or sooner termination thereof, they would return the boat in good order and condition, ordinary wear and tear excepted. The lease, which was in writing, also provided that the lessees should not be liable for any damage by fire. The libel alleged that on the 4th day of August, 1903, while the houseboat was in the exclusive possession and control of the libelees, under and pursuant to the lease, by reason of the direct carelessness and negligence of the libelees, and without any fault on the part of the libelant, the houseboat became and was wrecked, within the jurisdiction of the court below, to wit, in and upon the navigable waters near the harbor and port of Honolulu.

The facts constituting the alleged negligence of the libelees are set forth in the libel as follows:

"Prior to said August 4, 1903, said defendants and libelees, in whose sole and exclusive possession and control said houseboat then was, had moored said houseboat near the western shore of the entrance to Pearl Harbor in said Island of Oahu; and on said August 4, 1903, said defendants and libelees proceeded to remove said houseboat from said Pearl Harbor to the harbor

of Honolulu in said Island of Oahu. Said transportation was then and there attempted to be performed by said defendants and libelees by towing said houseboat in tow of the steam tug Kaena, then and there operated and controlled by said defendants and said libelees. Libelant further shows that at said time and place, and along with said houseboat, said defendants and libelees undertook to transport by towing in tow of said Kaena from said Pearl Harbor to said Honolulu harbor, and as part and parcel of the same tow of which said houseboat formed a part. two laden scows. It was then and there the duty of said defendants and libelees, in making up said tow, to see that it was then and there properly constructed, but this duty said defendants and libelees, by reason of the aforesaid carelessness and negligence, wholly failed and neglected to perform; and in this behalf this libelant shows that said tow was constructed in tandem, and was then and there so constructed that said houseboat was placed between said tug Kaena and said two laden scows hereinabove referred to. Libelant further shows that, when said tandem tow was constructed, said tug proceeded from said Pearl Harbor to said Honolulu harbor. At this time a fresh breeze was blowing; the wind being about N. E. by E., a fairly heavy sea was running, and there was a substantial swell. Libelant shows that, when said tug and tow had reached a point about one-half mile west of Kalihi entrance, said houseboat, by reason of the aforesaid carelessness and negligence of defendants and libelees, capsized and sank, and became a wreck and total loss, and in this behalf, this libelant shows that the superstructure of said houseboat contained two stories, with three rooms in the lower story and two rooms and a lanai in the upper story; and that when, as alleged, said houseboat capsized and sank and became wrecked, said entire superstructure, by reason thereof and in direct consequence of said capsizing, sinking, and wreck, became detached and broken away from said houseboat, thereby utterly ruining and destroying said houseboat, and rendering it wholly useless and valueless for the uses and purposes for which it was intended and held. And in this behalf libelant shows that said loss and damage were then and there immediately, directly. and proximately caused by the carelessness and negligence of said defendants and libelees, and in particular by the careless and negligent manner and method in which the aforesaid tug and tow were then and there operated by said defendants and libelees; and in particular by the careless and negligent manner in which said tow was constructed and made up by said defendants and libelees; and in particular by the careless and negligent selection by said defendants and libelees of the time at which said towage was attempted, having regard to the conditions of wind and sea then prevailing; and in particular by the careless and negligent attempt of said defendants and libelees to tow too much upon the occasion hereinabove alleged."

It was also alleged in the libel that the damage sustained by the libelant was occasioned wholly by reason of the carelessness and negligence of the libelees, and without any fault on the part of the libelant, by reason of which the libelant prayed a decree for the sum of $2,500.

In their answer the libelees admitted the alleged ownership by the libelant of the houseboat, and the copartnership of the libelees as alleged, and their engagement as such copartners in the business of bridge builders and general contractors. It admitted the execution of the lease as alleged in the libel, and the attempted towage of the houseboat from Pearl Harbor to Honolulu by means of the tugboat Kaena, and that the tugboat was operated and controlled by the libelees. It admitted that the tow included two laden scows in addition to the houseboat. It then alleged affirmatively that, during all of the times mentioned in the libel up to the 4th day of August, 1903, the husband of the libelant was in control of the boat, acting as the agent of the libelant in respect thereto; that the value of the house-

boat was $1,500; that the boat was delivered to the libelees under the lease by the libelant, through her said husband, at Pearl Harbor, situated some 10 miles from Honolulu, and that, under and pursuant to the terms of the lease, it became the duty of the libelees, at the termination thereof, to redeliver to the libelant the houseboat at Pearl Harbor; that the lease was, in accordance with the terms thereof, terminated on·the 29th day of July, 1903, and that the libelant was notified of the termination thereof that she might take possession of her boat; and that at no time subsequent to July 29, 1903, was said houseboat in the possession of the libelees under or by virtue of the lease, and that at no time after that date were the libelees, or either of them, in the sole possession or control of the boat under or pursuant to the terms of the lease; that at the termination of the lease, as set forth in the answer, the libelant requested the libelees to remove the houseboat from Pearl Harbor to the port of Honolulu for the convenience of the libelant, and that thereupon, and solely as a favor to her, the libelees agreed to so remove the boat, under the express stipulation and agreement that they would not be in any manner responsible for any loss or damage to the boat which might occur while it was being moved to the port of Honolulu; that such removal was attempted to be performed by the libelees by towing the houseboat in tow of the steam tug Kaena, then and there operated and controlled by the libelees, and along with two laden scows; that the tow was constructed in a proper and seamanlike manner and with due care; that, when the tow was so constructed, the tug proceeded from Pearl Harbor to Honolulu Harbor, at which time a light breeze was blowing, the sea smooth, and that there· was no appreciable swell; that, when the tug and tow had reached a point about one-half mile west of Kalihi entrance, the houseboat, without any carelessness or negligence on the part of the libelees "suddenly went over on one side," and that thereupon the libelees towed the houseboat into water where it could be anchored, and anchored the same, and proceeded with the tug to Honolulu with the persons who had been on board of the houseboat, and with the said laden scows; that after the arrival of the tug and the laden scows at Honolulu the tug returned to the spot where the houseboat had been anchored, and started to tow the same into the harbor of Honolulu, which was done, and a watchman left in charge thereof by the libelants; "that said houseboat turned over"; that the turning over of said houseboat was not due in any manner to the carelessness or negligence of the libelees, but was, as libelees are informed and believe, and so charge the fact to be, due to the fact that the said boat was not properly built into the scow, but, when originally constructed, was simply tacked to the scow with tenpenny nails, which became gradually loosened from the rocking of the scow; that the houseboat is not a total loss, and that the libelant had not suffered damage in the sum of $2,500.

The evidence shows without conflict that upon the conclusion of the appellees' work at Pearl Harbor they undertook to deliver the houseboat to the libelant at Honolulu, instead of Pearl Harbor, as

they might have done. It is contended on their behalf that they did so without charge, and at the request of the husband of the libelant, who, it is claimed, was acting as her agent in making the request. Let that be conceded, and still the fact remains that the appellants were in the exclusive possession and control of the houseboat at the time of its damage, and under the lease, for they had not then delivered the boat to the lessor. They were towing it to the port of Honolulu for that purpose, and were clearly liable for any tort committed by them during the towage growing out of their negligence. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; Alaska Commercial Co. v. Williams, 128 Fed. 362, 63 C. C. A. 92; The American Eagle (D. C.) 54 Fed. 1010. The maritime skill and care thus called for must be such as was reasonable under the conditions existing at the time—such as may be reasonably demanded under "the peculiar circumstances and emergencies of the case." Authorities supra; The Temple Emery (D. C.) 122 Fed. 180–182; The Joseph Peene (D. C.) 130 Fed. 489. The evidence shows that the houseboat had been lying for about six months at a place called Puuloa, in Pearl Harbor, with one end resting on the sands of the beach and the other end in the water, during which time it was occupied by the captain of the tug and other employés of the appellants. It was from that position that the captain of the tug took the houseboat and put it in a tandem tow made up of, first, the houseboat, and then two laden scows—one behind the other; the houseboat being thus placed between the pull of the tug ahead and the pull of the scows behind, neither of which was provided with a rudder. Obviously, therefore, the houseboat was subjected to a severe and unnecessary strain from both ends; and such is the testimony of the witnesses Neilson and Rouse, experienced shipmasters. The houseboat should have been towed alone, the only safe method, according to the testimony of Capt. Neilson, and certainly not in the position in which it was placed and where it was subjected to a double pull—that from the tug in front, and that from the laden scows behind. This of itself constituted, in our opinion, such negligence as renders the appellants liable for the damages sustained by the appellee; for the law is that it was the duty of the tug, in making up the tow, to see that it was properly constructed. Failing in that duty, she was guilty of a maritime fault. The Quickstep, 9 Wall. 665, 19 L. Ed. 767.

We are also of the opinion that the appellants were guilty of negligence in undertaking to tow the houseboat, in its known condition, in the then condition of wind and sea. Allusion has already been made to the fact that the captain of the tug had lived on the houseboat for about six months, and knew that during that time it lay with one end resting on the sands of the beach, and with the other end in the water, the effect of which, he explained in his testimony, was that "her seams opened up from naturally lying too long on the beach." He admits in his testimony that he would not have undertaken to tow her in a swell; and, while he denies that there was any swell during the towage in question, the evidence on the part of the appellee is to the contrary, and the court below found as a fact from such conflict-

ing evidence upon the point that "there was a swell that made it obviously dangerous for the houseboat to go to sea." We think that finding correct in view of the evidence. Moreover, it appears that the tug started with its tow from Pearl Harbor about 20 or 30 minutes past 2 o'clock p. m., at a time when the trade winds prevailed, which, according to the uncontradicted testimony in the case "always blow pretty strong in the afternoon until about sundown," whereas it is, according to the uncontradicted testimony, "decidedly calmer from 12 to 5 in the morning than at any other time of the day, under ordinary conditions." The inappropriateness of the time selected for the towage emphasizes the appellants' negligence in view of the other conditions existing.

But one other question remains to be considered, and that relates to the measure of damages. It is contended on behalf of the appellee that she is entitled to the full sum of $2,500 provided in the lease to be paid by the lessees in the event of the total loss of the boat. According to the evidence, the damage to it could not be repaired without the expenditure of an amount exceeding half her value after the repairs; and hence it is contended that the houseboat was a total loss, within the doctrine applicable to cases of marine insurance. If that doctrine be applicable to cases like the present one, it is a sufficient answer to the contention to say that there was no abandonment by the appellee of what remained of the boat in question.

The judgment is affirmed.