## JOHN MAHONEY *vs.* THE BRITISH SHIP "BRENDA."

### March 19, 1906.

*Pleadings—Issue Raised by Answer:* In a libel in admiralty by a seaman for damages and wages for violation of contract through an assault upon him by the master, in consequence of which he left the ship, the libellee in his answer alleged desertion and consequent forfeiture of wages. *Held,* that such allegation opened the way for libellant to introduce evidence to show that he had other legal grounds for leaving the ship as well as for violation of the contract through assault, as alleged in his libel.

*Right of a British Seaman to Leave His Ship at a Foreign Port for Unfitness or Inability to Proceed to Sea—Chronic Illness ias such Unfitness or Inability:* Unfitness or inability too proceed to sea being a sufficient reason for a seaman's leaving his ship under the *Merchant Shipping Act, 1894; Held,* that a seaman on a British ship was justified in leaving her in a foreign port, it being shown that during a long voyage to such port he suffered continually after the first week of the voyage from chronic rheumatism which prevented him from performing the regular duties of a seaman, and caused him at times severe pain.

In Admiralty: Motion for Rehearing.

Geo. A. Davis, Proctor for Libellant.
J. J. Dunne, Proctor for Libellee.

Dole, J. After the decision in this case and before decree, counsel for the libellee filed a motion for rehearing on the ground that the decision of the case was not responsive to the issues intended by the pleadings in said action and was not embraced within the issue thereof; and that the matter therein decided was wholly without the matters in issue in said cause. The motion is based upon the papers and records in the case. The libel alleges that on the 14th day of October the libellant was wantonly and cruelly assaulted by the master of the ship, and was compelled to leave the ship by reason of such assault and violation of the contract thereby, and claims damages for such assault, and his wages. The answer denies the assault and alleges desertion whereby it is claimed that the wages were

forfeited, and also alleges deductions therefrom on account of advances, of the slop-chest account, and that the libellant had been disabled for forty days in the early part of the voyage from performing his duties by reason of being afflicted with inflammatory rheumatism which he had contracted and suffered from for a long time prior to his shipment as a mariner in said ship. The assault was disproved at the trial and the court also found that it was not shown that libellant's illness was caused by "his own wilful act or default."

The fact of disability on account of illness for forty days shortly after leaving port has, as contended by counsel for the libellee, no relation to the question of inability on the part of the libellant to proceed on the voyage after arriving in the port of Honolulu on account of his illness, except as evidence of such forty days disability may be considered with the other evidence showing his illness during the rest of the voyage. Counsel for the libellee claims that the question of illness during the rest of the voyage was gone into on his part merely to show that the kindness of the master in giving libellant light work in view of his continued illness was inconsistent with the allegations of the libel charging the assault complained of, on the ground that the master, who had shown uniform kindness to a sick sailor, would not be likely to have made a cruel and wanton assault upon him. On the part of the libellant this evidence of illness was evidently gone into, in part at least, to emphasize the enormity of the alleged assault made upon a sailor who was weakened and suffering from illness, but there are portions of this evidence which tend to show that the desire of the libellant to leave the ship was based in part upon the fact of his illness. Three or four days before the date of the alleged assault, the libellant applied for a discharge. This, of course, had nothing to do with the assault. On the second day after the time of the alleged assault, the libellant left the ship.

His evidence on examination contains the following: "Q. And you stayed aboard until what time? A. Until the 14th of October I broke away. Q. Well, why did you break

away? A. The captain came to me in the morning—but before he came to me I was unable to work from rheumatism; I had become lame and I had been suffering all the passage. My arm was swelled up and it got swelled up that big (indicating), which all hands of the ship can state. The captain came to me and says, 'Are you going to work, are you going to work,' half a dozen times over. Q. When was that? A. On the morning of the 14th—on the morning of the 16th—and he says, 'I'll put you in the hospital,' a place where the sailmaker had lived and the cook during the time I had been aboard the ship— and he says, 'If you are unable to work,' he says, 'I will put you in the hospital and lock you up,' and went and threw my things out of the room and told me to go and get in there and I got in there and squealed very hard before he would let me out, and then I wanted to go ashore and I made a break for the gangway and got over the gangway." Again, on the direct, "Q. You are in fear and danger of your life? A. I am in danger of my life, not being able to work. If I was in good health I wouldn't mind so much, but am unable to work from rheumatism, lame in my arm. Q. Now, Mr. Mahoney, you say that you feel your life is in danger if you go on board the vessel and resume the voyage? A. Yes, sir. Q. You were in delicate health all the way out? A. Yes, sir. Q. Suffering from rheumatism? A. Yes, sir. Q. And still suffering? A. Yes, sir, still suffering; I am lame now." At the time of libellant's application for a discharge, previous to the alleged assault, he admitted that he had been well treated on the voyage. On his cross-examination the following appears: "Q. In other words, when you left the ship you made up your mind that you had left her for good? A. Yes. Q. And that you would only go back for the object of getting your things? A. Yes, because I was scared of my life, I haven't gone back yet; I am scared of the vessel."

His request for a discharge was refused by the master on the ground that he was not allowed to do so. In the master's testimony on cross-examination, he was asked, "Did he not tell

you that he was still suffering from rheumatism? A. He says so. Q. Did you not have a doctor examine him? A. No, sir. Q. He told you that he could not stay on the vessel, because he was unable to work because he was sick? A. No, he did not tell me that,—he told me he could not stay in the vessel. Q. Was he not able to go to sea? A. He did not want to go. Q. Because he was not able to—did he not tell you that? A. No."

Section 188 of the Merchant Shipping Act, 1894 (British), provides that,

"The master of a British ship shall not discharge a seaman or apprentice to the sea service abroad, or leave him behind abroad, ashore, or at sea, unless he previously obtains, endorsed on the agreement with the crew, the sanction, or in the case of leaving behind, the certificate * * * at any place elsewhere (than a British possession) of the British consular officer for the place * * * The certificate shall state in writing the fact and cause of the seaman being left behind, whether the cause be unfitness or inability to proceed to sea, desertion, or disappearance."

Section 231 of the said Shipping Act, provides that,

"(1) Whenever a question arises whether the wages of any seaman or apprentice are forfeited for desertion from a ship, it shall be sufficient for the person insisting on the forfeiture to show that the seaman or apprentice was duly engaged in or belonged to the ship, and either that he left the ship before the completion of the voyage or engagement, or, if the voyage was to terminate in the United Kingdom and the ship has not returned, that he is absent from her, and that an entry of his desertion has been duly made in the official log book. (2) The desertion shall thereupon, so far as relates to any forfeiture of wages under this part of this Act, be deemed to be proved, unless the seaman or apprentice can produce a proper certificate of discharge, or can otherwise show to the satisfaction of the court that he had sufficient reasons for leaving his ship."

The answer has alleged desertion and that libellant's wages are forfeited on that account, and the question arises under such issue, in which the law affords an opportunity to the one claiming wages, to show to the satisfaction of the court, if he had no certificate of discharge, that he had sufficient reasons for leaving the ship, whether he may put in evidence of any good reason he may have had for leaving the ship, and, if this should be decided in the affirmative, whether there is evidence showing such sufficient reasons? One of the grounds given in the Merchant Shipping Act for which a certificate of discharge may be granted is "unfitness or inability to proceed to sea." Counsel for the libellee contends with much force that the proofs must follow the allegations and that there has been no allegation in this case of unfitness or inability. But the libellee having raised in his answer the issue of desertion, has he not, therefore, by such allegation, opened the door to the libellant for putting in any evidence to show that his departure from the ship was justified and therefore not a desertion whereby his wages are forfeited? I feel that this question is properly answered in the affirmative and that the case was thereby open for evidence of the libellant's unfitness or inability to go to sea, and that the libellee cannot justly complain of surprise upon the introduction of such evidence. The following authorities, I think, support this position, although they apply to conditions perhaps less strong than the circumstances in this case, as they do not, as in this case, show any allegations in the answer opening the way for the evidence objected to:

"It is objected that the libel does not specifically charge this antecedent negligence as a fault. This is true, and the libel is defective on that account, but in admiralty an omission to state some facts which prove to be material, but which cannot have occasioned any surprise to the opposite party, will not be allowed to work any injury to the libellant, if the court can see there was no design on his part in omitting to state them. There is no doctrine of mere technical variance in the admiralty, and subject to the rule above stated, it is the duty of

the court to extract the real case from the whole record, and decide accordingly. It is very clear that the libellant had no design in view in omitting to state the failure to stop as a fault, and equally clear, that the proof on that subject, coming, as it did, from the opposite party, could not have operated to surprise them." *The Steamer Syracuse,* 79 U. S. (12 Wall.) 167, 173; *The Clement,* 2 Curtis, 363, 367.

"If the admiralty, like other courts, proceeds *secundum allegata et probata,* and requires proper pleadings to apprise the respective parties of what they are to meet, and to prevent surprise, yet where the facts fully appear without objection, and there is no dispute or question concerning them, it would be a perversion of justice to disregard them; and in such a case the pleadings should be deemed to be amended accordingly; the only question is one of costs." *The Rhode Island,* 17 Fed. Rep. 554, 560.

With this conclusion of this question, the authorities cited by counsel for libellee on this point do not appear to apply to the circumstances of this case.

The evidence in this case satisfactorily shows to my mind legal grounds for a discharge, to-wit, "unfitness or inability to proceed to sea," and that the master should have arranged for a submission of the libellant's request for a discharge to the consul. The libellant had good reason to apply for a discharge and did apply some days before the alleged assault; and his evidence, although mainly directed to the issue of the assault, contains much which tends to show that he desired his discharge on account of his physical condition and that his dread of going to sea was based largely on the fact of his illness. As he expressed it, "I am in danger of my life not being able to work. If I was in good health I wouldn't mind so much, but am unable to work from rheumatism; lame in my arm"; also, "Q. Why did you break away? A. The captain came to me

in the morning—but before he came to me I was unable to work from rheumatism; I had become lame and I had been suffering all the passage"; and as the captain testified, "he told me he could not stay in the vessel," when he applied for his discharge.

The motion for rehearing is overruled.