## THE SEA LION.

(District Court, N. D. California, S. D. January 19, 1926.)

No. 17917.

**1. Towage ⊛⇒14.**

Tug cannot, by contract with tow, exempt itself from liability for negligence.

**2. Towage ⊛⇒12(1).**

Owner of tow, to recover for its loss, must show that it was seaworthy for voyage contemplated at season in question.

**3. Towage ⊛⇒4, 15(2).**

Tug is not liable as common carrier, and injury to or loss of tow raises no presumption of negligence of tug.

**4. Towage ⊛⇒15(2)—Evidence that loss of tow was due to wind and waves held to overcome any prima facie case against tug.**

Evidence that loss of tow was due to wind and waves *held* to overcome any prima facie case against tug, made by proof of loss, and impose on libelants burden of proving negligence.

**5. Towage ⊛⇒12(1).**

Barge seven years old, built for bay work, and never recaulked or resheathed, *held* unseaworthy for ocean tow of 200 miles in March.

**6. Towage ⊛⇒11(9)—Tug, making ocean tow in March, held not negligent in proceeding directly into wind, which was not unusual.**

Captain of tug, making ocean tow in March, when better weather was not to be expected, *held* not negligent in proceeding directly into wind, in view of records showing wind was not unusual.

**7. Towage ⊛⇒11(1).**

Question of negligence of tug losing tow depends on circumstances of each case.

**8. Towage** ⊜⇒**14.**

Contract exempting tug from liability for loss of tow, though void, may be material in determining tug's negligence in losing tow, as showing what parties contemplated.

**9. Towage** ⊜⇒**11(1).**

Tug cannot be held negligent for undertaking to do what circumstances and nature of contract with tow show was within contemplation of parties.

In Admiralty. Libel by the Hammond Lumber Company against the American tug Sea Lion, her engine, boilers, tackle, apparel, furniture, and equipment, and Shipowners' & Merchants' Tugboat Company, claimant. Libel dismissed.

Bell & Simmons, of San Francisco, Cal., for libelant.

Thacher & Wright and H. A. Jones, all of San Francisco, Cal., for respondent and claimant.

KERRIGAN, District Judge. [1] This case presents the already often considered question, whether or not by stipulation with a tow a tugboat can limit its liability for negligence. On exceptions to the libel, Judge Partridge ruled that this should be determined only after all the facts had been brought before the court, and for that reason left it undecided.

In Alaska Commercial Co. v. Williams (C. C. A. 9) 128 F. 362, 366, 63 C. C. A. 92, relying upon The Steamer Syracuse, 12 Wall. 167, 20 L. Ed. 382, the Circuit Court of Appeals for the local circuit held that a towing vessel could not relieve itself by contract from liability for failure to exercise reasonable care and skill in the performance of its service. In The Oceanica, 170 F. 893, 895, 900, 96 C. C. A. 69, however, the Circuit Court of Appeals of the Second Circuit took a contrary view, saying on motion for rehearing: "We do appreciate keenly that the decision of the majority of the court as to the right of a tug to contract against her own negligence is a departure from previous decisions. The question should, and we hope will, be set at rest in this case by the Supreme Court." An application for certiorari thereupon was made, but denied. Boland v. The Steam Vessel Oceanica, 30 S. Ct. 400, 215 U. S. 599, 54 L. Ed. 343.

In Mylroie v. British Columbia Mills Tug & Barge Co. (C. C. A. 9) 268 F. 449, 452, the Ninth Circuit Court of Appeals again had the question before it, and in a carefully written opinion adhered to its former ruling. "It seems to us," said Judge Ross, "that, if the Supreme Court had been dissatisfied with its previous decision in the case of The Steamer Syracuse, it would have granted the writ of certiorari in the case of The Oceanica, and have reconsidered the question, and that we would not be justified in regarding its denial of the writ in the last-mentioned case as in effect departing from the rule announced in the case of The Syracuse, which has stood unreversed * * * for so many years, particularly as the case was relied upon in both the prevailing and dissenting opinions in The Oceanica. * * *"

This decision was rendered on October 4, 1920. On June 2 of the same year, in Ten Eyck v. Director General of Railroads (C. C. A. 2) 267 F. 974, 976, the Circuit Court of Appeals of the Second Circuit again had held that a contract between tug and tow, by which the latter assumed all risks of the towage, was not invalid as against public policy. On October 25, certiorari was refused in this case by the Supreme Court (41 S. Ct. 14, 254 U. S. 646, 65 L. Ed. 455), but in the Mylroie Case it was granted (41 S. Ct. 322, 255 U. S. 566, 65 L. Ed. 789). After full argument, the judgment of the lower court was affirmed, but on another ground than that which it had taken; the Chief Justice saying: "This makes it unnecessary for us to consider the contention on behalf of the barge that the exemption clause is void." British Columbia Mills Tug & Barge Co. v. Mylroie, 42 S. Ct. 430, 259 U. S. 1, 12 (66 L. Ed. 807).

On January 26, 1925, in Sacramento Navigation Co. v. Salz (C. C. A. 9) 3 F.(2d) 759, 761, the Ninth Circuit Court of Appeals again had occasion to express its views upon the subject, and with emphasis approved its holdings in the cases above referred to. Of The Oceanica, supra, which had been characterized by the judges who decided it as "a departure from previous decisions," Judge Gilbert said: "We think it is a departure from the principles announced in the decisions of the Supreme Court [Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 9 S. Ct. 469, 129 U. S. 397, 32 L. Ed. 788; The Syracuse, supra] which we have cited." Certiorari once more was granted (45 S. Ct. 509, 268 U. S. 683, 69 L. Ed. 1155), but at the present time it appears

to be unlikely that the question now in dispute will be adjudicated, because of its incidental relation to the facts of the case.

For the purposes of this case, both Alaska Commercial Co. v. Williams, supra, and Mylroie v. British Columbia Mills Tug & Barge Company, supra, have been approved by the court in which they were decided, within the last year, while the New York cases, which it expressly disapproves, have not as yet been given the weight of binding authority. If, as was said by the District Court of Georgia four months ago (The Pacific Maru, 1925 A. M. C. 1446, 8 F.[2d] 166), it must be assumed that "if the Supreme Court, when it had under consideration the Mylroie Case, had been satisfied that this particular question had been decided in The Syracuse, it would inevitably have disposed of the question * * * by stating that [it] has been settled," then in like manner it must be taken for granted that, when Chief Justice Taft refused to pass on the exemption clause in the Mylroie Case, he was not satisfied that it had been disposed of by denials of certiorari. Hence I consider myself bound to hold that in this circuit a tug cannot exempt itself from liability for negligence.

Turning now to the facts of the present case, it appears that on March 10, 1923, libelant delivered to claimant a 75x32-foot barge, or lighter, for towage from San Francisco to Eureka. Contemporaneously an agreement in writing was entered into between the parties, according to the terms of which $500 was made payable *on delivery* of the tow at its destination. "It is understood and agreed that [respondents] are not to assume any tower's liability, or be responsible in any way for the seaworthiness of the lighter towed."

At 3:10 on the afternoon of March 10, with the barge on an 800-foot hawser, claimant's tug Sea Lion left San Francisco Bay. What took place thereafter is not entirely clear, but it is evident that heavy weather was encountered near Point Reyes; that during the night the barge became waterlogged, and made little progress; that on the morning of the 11th it was broken, overturned, and partially demolished; that at 12:30 p. m. on that day, when about 50 miles north of San Francisco and 150 miles south of Eureka, the tug turned back; and, finally, that in the vicinity of Point Reyes its tow broke up and went to pieces.

[2, 3] The principal issues of fact are two: Whether the barge was seaworthy, and whether or not claimant was guilty of negligence. There can, of course, be no dispute that libelant was required to have it in a seaworthy condition to encounter the usual and ordinary weather on the contemplated voyage, at the season in question (The Edmund L. Levy [C. C. A. 2] 128 F. 683, 684, and cases cited); for a tug undertakes only to exercise that degree of care necessary for the management of a seaworthy tow, and its liability, as is well settled, is not that of a common carrier. It also must be conceded that, "unlike the case of common carriers, no presumption of negligence on the part of a tug arises from the mere fact of an injury to her tow, and the burden rests upon the tow to prove that its loss or injury was due to negligence on the part of the tug. * * *" 38 Cyc. 585; The Clarence L. Blakeslee (C. C. A. 2) 243 F. 365, 366, 156 C. C. A. 145.

[4] Libelant's contention is that, even as a bailee required only to exercise ordinary care, respondent is bound to show how the barge was lost, before it can throw upon its owner the burden of proof of negligence. The Seven Sons (D. C.) 29 F. 543, 544. This amounts to saying that proof of the loss makes out a prima facie case of negligence, and is a correct statement of the law. Jones on Evidence (2d Ed.) § 186; The Kalkaska, 107 F. 959, 962, 47 C. C. A. 100. But it is inapplicable to the case at bar, for there is an abundance of evidence in the record tending to show that the barge was lost without fault, through the action of wind and waves, which is amply sufficient to overcome the weight of libelant's prima facie case. The burden of proof, therefore, must be sustained, unaided by rules of law.

[5] Without discussing respondents' evidence upon the subject, my finding is that the barge was not seaworthy for March towage from San Francisco to Eureka. It was seven years old, and had not been recaulked or resheathed since it was built. The inspectors who examined it, at the time of its purchase by libelant, undoubtedly acted in good faith; but in view of the age of the barge, and of the almost inevitable roughness of ocean towage at that season of the year, it hardly can be said that their examination was adequate. The witness Sutherland, who I think was best qualified for such work, remained on board for only 30 minutes, and made his inspection while the barge was afloat. Furthermore, he had no means of testing the caulking, which on libelant's own evidence had about reached the limit of its durability, except a pocketknife. In sound

condition the barge would have been worth approximately $4,500. Yet it was sold to libelant for $2,500 by a company which is said to have purchased it for $500 two years before.

Libelant argues that no possible motive can be assigned either for its purchasing an unseaworthy barge, or for its being led to do so. The answer suggested by respondents is that the barge was intended for use in bay work on Humboldt Bay, and that libelant was unwilling to spend sufficient money upon it to make it seaworthy for ocean towage, for the short trip in question. The inference is that libelant knowingly took the risk, against which it protected itself by insurance (which was obtained at a high rate), and by a contract of towage on which it would not be liable in case the barge was lost. I find considerable merit in the suggestion, for it is strongly borne out by the purported exemption from tower's liability, and by the circumstances which accompanied its insertion in the contract.

The barge had been used by the Crowley Company only for light bay work, and had not been reconditioned in any substantial manner during the two years in which it was held by that company. It was not constructed for ocean towage, for it was flat-bottomed, and instead of being equipped with a pointed prow, was simply cut away fore and aft. Two hundred miles of such towage might not have injured it in the summer time, or even in March, had the weather been unusually favorable. But I am unconvinced that (as the libel alleges) it was "tight, staunch, strong, and seaworthy" to resist the winds and waves normally and reasonably to have been expected in the vicinity of Point Reyes during that month.

[6] Libelant's second contention is that the captain of the tug was guilty of negligence in proceeding directly into the northwest wind, which caused the loss, instead of taking refuge in Drake's Bay or Bodega Bay, and waiting for calmer weather. In support of this, reliance is placed on certain records of wind velocities from the Point Reyes station of the Weather Bureau, according to which the average velocity of wind between the hours of 1 and 7 a. m. on March 11, 1923, was 54 miles an hour. It may be admitted that for the master to have attempted to make headway against such a wind with a square-ended, flat-bottomed barge would have constituted reckless, if not willful, negligence. But it appears that the records mentioned do not properly indicate the

strength of the wind with which the Sea Lion had to contend, and hence that they have little relevancy here.

Edward H. Bowie, senior meteorologist of the San Francisco Weather Bureau, testified without contradiction that the Point Reyes wind velocities are misleading when applied to winds from the northwest, because the wind from that direction blows into a restricted channel near that station, with the result that its velocity is increased. He further testified that this fact is recognized by the Bureau, and to such an extent that, although storm warnings are ordered set whenever another wind attains a velocity of 40 miles an hour, for northwest winds under 68 miles an hour this is not done. Modified by the deduction which very evidently must be made, the records of March 10 and 11 are not unusual, but, on the contrary, indicate that the wind on those days was that which was normally to have been expected at that time. They are inadequate to establish the negligence of which libelant complains.

So, likewise, is the testimony of the captain of the Admiral Goodrich, for, if due allowance is made for the speed which his vessel evidently was making, which, of course, was in excess of that of the tug, the winds which he met were not such as to have required the latter to take shelter. After the water-logging of the barge, it would have been without purpose to return to Drake's Bay, and the attempt to proceed was for that reason, I think, properly made.

[7, 8] Negligence, it may be added, depends upon all the facts and circumstances of each case. It may amount to want of due care to tow a barge in one of the summer months into a 30-mile breeze. But at that season of the year more favorable weather may reasonably be expected to follow a short delay. In March, on the other hand, such winds appear to be the rule, rather than the exception, and such an expectation would not be well founded in the region here involved. The barge in this case was towed out into the weather which destroyed it, at libelant's order, under circumstances indicating that the danger attendant upon such action was fully recognized. The stipulation as to assumption of risk, as has been shown above, is void; but it is far from immaterial in determining whether or not the tug was guilty of negligence.

[9] A tug which has done exactly what it was employed to do, under circumstances which were within the contemplation of the

parties at the time they made their contract, cannot with reason be. said to have acted negligently. This, I believe, is what Judge Partridge had in mind when he overruled exceptions to the answer herein, and is entirely consistent with the decisions of our Circuit Court of Appeals.

The libel is dismissed. Let a decree be entered for claimant, with costs.