## THE DEFENDER.

## THE FEARLESS.

(District Court, W. D. Washington, S. D.    October 21, 1913.)

No. 921.

1. TOWAGE (§ 11*)—CHARTER—LIABILITY FOR NEGLIGENCE OF TOWING TUG.

A provision of a charter party of a vessel to carry a cargo of lumber, giving the charterer the right to load at more than one mill by paying the extra cost of towage, did not require the charterer to furnish the towing tug, and, in the absence of further agreement, it was not liable for the negligence of the tug, which was presumably employed by the master.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. TOWAGE (§ 11*)—STRANDING OF TOW—LIABILITY OF TUG.

A barkentine partially loaded with lumber, while being towed downstream to another loading point at night, ran aground on the right bank, and in pulling her off by the stern the tug permitted her to strike the opposite bank, where she grounded and was injured. The channel was 200 feet wide. Held, that the tug was responsible for the movement of the tow and that the stranding was due to its negligence.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

3. TOWAGE (§ 11*)—INJURY TO TOW—LIABILITY OF TUGS.

Where a vessel is being towed by two others, in order to hold both liable for her injury, it must be shown that both were negligent.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by the Barkentine Lahaina Company, owner of the barkentine Lahaina, against the tug Defender, the launch Fearless, and the Quinault Lumber Company. Decree against the Defender alone.

Huffer & Hayden, of Tacoma, Wash., for libelant.

Libelant relies upon the following authorities: S. S. Syracuse v. Thos. Langley, 12 Wall. 167, 20 L. Ed. 382; Grand Trunk Ry. Co. of Canada v. Griffin (C. C.) 21 Fed. 733; Tug Margaret v. Chas. S. Bliss, 94 U. S. 493, 24 L. Ed. 146; The Atlas (D. C.) 12 Fed. 798; The W. G. Mason (D. C.) 131 Fed. 632–636; S. S. W. H. Webb, 14 Wall. 406, 20 L. Ed. 774; Sicula Americana Di Navigazione A Vapore v. Dalzell (D. C.) 204 Fed. 697.

Welsh & Welsh, of So. Bend, Wash., for respondents the Defender and Quinault Lumber Co.

M. M. Richardson, of Vancouver, Wash., for respondent the Fearless.

In addition to certain authorities cited by libelant, respondents rely upon the following: 38 Cyc. 578, 579, 563, 582, 585, and notes 62 and 63; The Columbia, 109 Fed. 660, 48 C. C. A. 596; The Anthracite, 168 Fed. 693, 94 C. C. A. 179; The Blue Bell (D. C.) 189 Fed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

824; The E. V. McCaulley (D. C.) 189 Fed. 827; W. E. Gladwish, 196 Fed. 490, 116 C. C. A. 185; The J. P. Donaldson, 167 U. S. 599, 17 Sup. Ct. 951, 42 L. Ed. 292; The Webb, 81 U. S. (14 Wall.) 406, 20 L. Ed. 774; The Burlington, 137 U. S. 386, 11 Sup. Ct. 138, 34 L. Ed. 731; McNally v. The L. P. Dayton, 120 U. S. 337, 7 Sup. Ct. 568, 30 L. Ed. 669; The Samuel E. Bouker (D. C.) 141 Fed. 480; Southern Towing Co. v. Egan, 184 Fed. 275, 106 C. C. A. 417; Heckman v. The Barge Richard III, 3 Alaska, 453; The Oak, 152 Fed. 973, 82 C. C. A. 327; The Syracuse (C. C.) 36 Fed. 830; The El Rio (D. C.) 162 Fed. 567; The Edmund L. Levy, 128 Fed. 683, 63 C. C. A. 235; The Narragansett (C. C.) 20 Fed. 394; The Nellie Flagg (D. C.) 23 Fed. 671; The James P. Donaldson (D. C.) 19 Fed. 264; The Morris & Cummings Dredge Co. v. Moran Towing & Trans. Co. (D. C.) 163 Fed. 610, affirmed 177 Fed. 1004, 100 C. C. A. 427; Woodberry v. Josephine, 58 Fed. 813, 7 C. C. A. 495; The Startle (C. C.) 115 Fed. 555; The Frederick E. Ives (D. C.) 25 Fed. 447; The Royal (D. C.) 138 Fed. 416; The Coney Island (D. C.) 115 Fed. 751; Stricker v. The Maurice (D. C.) 128 Fed. 652; The Jacob Brandow (D. C.) 39 Fed. 831; The Oceanica, 170 Fed. 893, at pages 894 and 895, 96 C. C. A. 69.

CUSHMAN, District Judge. This suit is for decision, after issue joined and evidence taken, upon a libel in rem against the tug Defender and launch Fearless, and in personam against the Quinault Lumber Company, brought to recover damages from the stranding of the barkentine Lahaina, alleged to have been caused by negligent towing.

In June, 1911, the barkentine was loading a cargo of lumber on Willapa Harbor, under a charter party between the owner of the vessel and J. J. Moore & Co., of San Francisco. The respondent Quinault Lumber Company was furnishing the lumber cargo contracted to be carried under the charter.

[1] Libelant alleges that the Quinault Lumber Company employed the tug to tow the barkentine, then partly loaded, from Raymond, down the Willapa river to South Bend, about four miles, where she was to receive the remainder of her cargo. There is evidence of a contradictory nature as to the hiring of the tug. The charter party provided:

"Charterers also have the privilege of loading vessel at two mills, they paying the extra cost of towage."

The stranding of the barkentine occurred while she was being towed from the second to the third mill. No question had been made on account of the loading being done at three instead of two mills. It is therefore concluded that nothing more was contemplated by the master and mill company than a compliance with the above provision, which only bound the charterer, for whom the mill company was acting, to pay the extra cost of towage, and did not bind them to furnish a towboat. The extra cost was to be paid the vessel's owner, as was the money for freight and delays.

The mere fact that the mill company had made payments direct to the tug owner is not considered significant; as long as there was no question concerning amounts, this course would be natural, as avoiding delay. There is not sufficient evidence that, by the conversation between the master and the representative of the mill company, concerning the securing of the tug, a different arrangement was made by which the mill company was to furnish the tug. Therefore the libel must be dismissed as to the mill company.

[2] The Lahaina, a wooden vessel, was built in 1901, being 200 feet long, 40 feet beam, and of 994 tons. After loading 1,100,000 feet of lumber at Raymond, she was taken in tow by the tug, a 200 horse power boat, and the launch, 38 horse power, near midnight on July 12th. It was necessary to leave at this time of night in order to take advantage of an eight or nine foot tide, to reach a bad turn in the river at flood tide and slack water. The barkentine touched twice on the starboard bank going down, without damage and with only slight delay. On the second grounding the tug, being unable to pull the Lahaina off by the head, went astern, and, with the launch, pulled her off the right bank; but she went stern first upon the left bank, from which she could not be removed. She remained there about 12 hours. It is for the damage she is alleged to have suffered during this time that recovery is sought.

From the point of the second grounding, up the river, there is a comparatively straight course. While above this point the channel of the river is narrow, probably averaging less than 100 feet, at this point, the channel, at the then stage of water, was 200 feet wide, sufficient to float a vessel loaded, as was the barkentine, to 20 feet.

Capt. Bell, of the tug Defender, in his testimony (pages 70 and 71) after stating that Capt. Carlson, of the Lahaina, ordered him to give another pull, and he had told Capt. Carlson that the vessel was moving, testified as follows:

"Q. Why didn't you, if you knew it was going into the other bank—you knew that was not the proper place for her? A. Yes.

"Q. Why didn't you stop her headway? A. Capt. Carlson ordered me to pull her back.

"Q. So that, regardless of the consequences, you continued? A. I did not know; I was acting under instructions from Capt. Carlson.

"Q. So that you say that you could not have pulled the stern of the La-. haina around up the center of the channel and kept her off the other bank; do you mean to say that? A. I might have; but we wanted to go downstream.

"Q. You could have pulled her upstream and prevented her going into the other bank? A. Yes.

"Q. Then you let her drift across the channel while you sent the Fearless ahead to stop headway? A. No, we both got to her head as quick as possible.

"Q. You both let her go? A. Yes. * * *

"Q. But you did not think she would go on the opposite side when you let go? A. I was afraid she would; that is why I told Captain she had sternway.

"Q. But answer the question; when you let go, you did not expect she would go on the other bank? A. I was afraid she might.

"Q. Yet you let go; couldn't you at that time pull her stern up the river? A. No, sir.

"Q. You could not have attempted to? A. Yes, I could have attempted to.

"Q. You did not attempt to? A. No."

From this it is concluded that the Lahaina was stranded by the negligence of the master of the tug in pulling her off of the right bank in the manner in which he did.

It is urged upon the part of the respondent that the causal fault, if any, was the fact that, after the master of the tug, upon a statement of the amount of the barkentine's load, agreed to do the towing, unknown to him, 35,000 feet more of lumber were loaded on her, chiefly forward, and that this put the barkentine "down by the head," and that there was a further fault in that there was but one man at the wheel upon the Lahaina while going down the river, and he inexperienced, all of which caused her to steer so badly as to be run upon the bank.

If the stranding could be directly traced to either of these conditions, it would be necessary to make further inquiry as to how far they affected it. The court finds no preponderance of evidence that the Lahaina was steered badly; but, if such was the cause of the second grounding, it would only be one of the remote causes of the final stranding, for at that time she was being towed astern, being controlled solely by the tug, with no claim made that the wheel could have been handled so as to prevent this stranding. Grand Trunk Ry. Co. v. Griffin (C. C.) 21 Fed. 733.

The extra lumber did not increase her draft six inches, probably not over four. If such a slight increase in draft was sufficient to cause her grounding, the master of the tug should not have undertaken the tow.

There is evidence on the part of respondents that the captain of the Lahaina, when he engaged the tug, assured the master of the latter that his vessel would assume all of the risk in being towed down the river in the nighttime. Owing to the nature of the service and the situation of the parties—the master of the tug being fully aware of the conditions, the tow captain not— in any event, the court would require such an agreement to be clearly established before giving effect to it. Concerning this matter, the court finds nothing more than loose talk having been indulged in on the part of the men concerned and, while the darkness might have been one of the causes of the striking on the starboard bank, while the tug was maneuvering to ascertain concerning a bend in the river, immediately below, yet it was not the cause of the final stranding. S. S. Syracuse v. Thomas Langley, 12 Wall. 167, 20 L. Ed. 382.

The captain of the tug testified that the master of the Lahaina, after the latter had been pulled off the starboard bank, directed that she be given "another pull," and that this was the cause of the final stranding. It is not necessary to determine whether anything said by the master of the Lahaina was anything more than a suggestion, or advice. The tug's captain was in control of the situation and should have known the conditions. Even if such a direction was given by the master of the Lahaina, nothing appears to warrant the finding that such direction was given to pull across the river, instead of up it. The cause of the stranding was the negligent manner in which the pull was made, rather than that a further pull was made.

[3] The remaining questions concerning negligence pertain to the launch Fearless; the part taken by her in the towing and the final maneuvering, resulting in the stranding of the Lahaina. In order to justify both the tug and launch being held liable, the evidence must show that both were negligent. The W. G. Mason, 142 Fed. 913, 74 C. C. A. 83; The Anthracite, 168 Fed. 693, 94 C. C. A. 179; Sicula Americana Di Navigazione A Vapore v. Dalzell et al. (D. C.) 204 Fed. 697.

The Fearless was engaged for the purpose of swinging the tow around the bend in the river below the point of stranding. Though the launch may have assisted in pulling the tow off the starboard bank, it appears that she had cast off her line and gone to the bow and had not again made fast at the time the further pull was given, resulting in the grounding. The libel as to the Fearless will be dismissed.

The Lahaina was a wooden vessel, built in 1901, and, at the time of stranding, was full of timber below decks and with almost a complete deck load. She went to sea with a full cargo of lumber—1,300,000 feet. At the time of stranding she had in her hold and on deck 1,-100,000 feet.

As the tide went down after the stranding, she listed to starboard. The evidence varies as to the amount of this list, from 10 to 45 degrees. The testimony is also conflicting concerning the character of the bottom at the point on which she lay both as to contour and firmness. When she went aground there were about 16 inches of water in the hold and at noon next day there were 36 inches.

The bottom on Willapa Harbor and river, generally, is soft. At the wharf in Raymond, and afterwards at South Bend while loading, at low tide, the bottom of the vessel rested on the mud. This was usual with other vessels and had resulted in there being a depression in the muddy bottom conforming, substantially, to the shape of a vessel's bottom.

The captain of the Lahaina testified to having heard, during the night of the stranding, reports in the hold, which were not unlike those of a gun. The court is unable to find whether this was caused by the straining of the vessel's hull, as claimed by libelant, or the breaking of pieces of lumber forming part of the cargo, occasioned by the list.

After reaching South Bend, the vessel was examined, under water, by a diver, and her "top sides" by a marine surveyor of experience. The diver found nothing the matter. The surveyor found certain evidences of straining in her seams and the breaking of the fresh paint along them. This surveyor for the insurance company required the installation of a gasoline engine for pumping, before allowing the boat to complete her voyage, and that she be put on the dry dock for examination and repairs at Sidney, Australia, for which point she was bound. This requirement was in anticipation of increased leakage on account of strain.

After reaching South Bend, she did not leak more than the ordinary wooden vessel—20 to 22 inches—but more than was usual for the Lahaina. It is probable that, in the quiet water of the harbor, the bot-

tom resting in the mud twice a day, leakage was prevented, to a certain extent. In a storm, before reaching Australia, the leakage was as much as 40, 50, or 60 inches a day. Before stranding, her leakage did not exceed 16 to 20 inches in any kind of weather.

She had come direct from San Francisco to Willapa Harbor, for her cargo, and, before leaving San Francisco, had been caulked on her bilges and repainted. The testimony shows that, while at Raymond, her leakage was less than usual. At Sidney, she was put on the dry dock and examined by marine surveyors for the parties and certain repairs required, which were made. The examination of the surveyors disclosed that the lead scuppers were broken, the keel was bruised, the rudder post strained, certain stanchions loosened, and the seams and cement along the garboard and sheer streak loosened. From this it is concluded that the Lahaina suffered from straining at the time of stranding. The locations of the scuppers, garboard, and sheer streak, at the angles and those parts of the hull most nearly resembling an angle, and therefore the parts of any structure most likely to show evidences of strain, render their injury significant. The starting of the rudder post may have been occasioned by having gone aground stern first.

The extent of injury from strain could not be determined without removing much of the inside structure of the vessel, which was not done. There will therefore be no general damage allowed for straining to the vessel, but the items of special damage, directly caused by the stranding, will be awarded against the Defender. These items, as claimed, total $4,294.74. The following items claimed will be disallowed: Cost of gasoline engine, $335.40; work of installing it, $64; cutting pipe for its installation, $2—for the reason that, while required because of the stranding, they make for the betterment and permanent equipment of the ship, and their cost does not afford a measure of damage. Twenty cases of gasoline, $47—for reasons dependent upon the foregoing, will also be disallowed.

Seven cases of copper paint were used on the vessel's bottom after being repaired. This was necessary to cover up the caulking and cement in the seams and to protect the metal used in the keel repairing; but the evidence shows that it was usual to paint the vessel at San Francisco after each round trip to Australia. She was not painted after her return upon the trip in question. It is therefore apparent that but one-half of this item is properly chargeable herein.

For the same reason, there should be a deduction from the item of 42 pounds, made for, "docking vessel for one day and providing labor for cleaning the bottom of hull and painting from sixteen-foot water line to keel," of one-half the amount thereof covering the painting. As there is nothing in the evidence to disclose what portion of this item was for painting, if counsel cannot agree concerning this question, they will be heard further.