## COMPANIA DE NAVEGACION, INTERIOR, S. A., v. FIREMAN'S FUND INS. CO., and ten other cases.

(District Court, E. D. Louisiana, New Orleans Division. July 8, 1926.)

Nos. 17205–17215.

**1. Insurance ☞146(3).**

Generally, insurance policies should be liberally interpreted in favor of assured, and doubtful provisions construed against insurer.

**2. Insurance ☞403.**

Implied warranty in contract insuring inland water vessel when being towed on open sea voyage *held* to be that it was seaworthy inland water vessel and able to stand ordinary perils of navigation on such waters.

**3. Insurance ☞403.**

Choppy sea and waves approximately four or five feet high and 25 mile wind *held* extraordinary condition as to inland water vessel being towed on open sea, amounting to such peril of sea as was contemplated by contract of insurance for sea voyage.

**4. Insurance ☞403.**

Sinking and loss of inland water vessel being towed on open sea *held* due to "extraordinary condition of weather and sea" and to be within contract of insurance.

**5. Insurance ☞665(4).**

Evidence *held* to show that sinking and loss of inland water vessel being towed on open sea was not result of its unseaworthiness, so as to release liability of insurer.

**6. Insurance ☞603.**

Insurers *held* not released from liability on contract insuring inland water vessel being towed on open sea because of clause in towage contract releasing towing ship from liability, inserted according to custom known by underwriters.

**7. Insurance ☞153.**

Every contract of insurance is presumed to be made with knowledge of customs and practices of trade in which insurance is made.

**8. Towage ☞14.**

Clause in towage contract releasing towing boat from liability *held*, by reason of obscurity of its terms, not to release it from liability for loss or damage growing out of tower's negligence.

**9. Towage ☞11(1).**

Towing boat must exercise reasonable care and caution and maritime skill, although not having liability of common carrier.

**10. Towage ☞11(1).**

Towing inland water vessel on open sea voyage at speed of nine miles an hour *held* not negligence.

In Admiralty. Separate libels by the Compania de Navegacion, Interior, S. A., against the Fireman's Fund Insurance Company, the Globe & Rutgers Fire Insurance Company, the Northwestern Fire & Marine Insurance Company, the Hartford Fire Insurance Company, the National Liberty Insurance Company, the Ætna Insurance Company, the Western Assurance Company, the London, Liverpool & Globe Insurance Company, the Springfield Fire & Marine Insurance Company, the Franklin Fire Insurance Company, and the Phœnix Insurance Company. Decree for libelant in each case.

John D. & M. A. Grace and E. H. Grace, all of New Orleans, for libelant.

Dart & Dart, of New Orleans, La., for respondents.

BURNS, District Judge. These suits were commenced by eleven libels against the defendant insurers, each for their respective contract portion of $85,000, with interest from July 20, 1922, for the total loss of the steam tug Wash Gray on the Gulf of Mexico, in tow of the steamship Freeport Sulphur No. 1, from Tampico, Mexico, to Galveston, Tex., via Freeport, Tex., on June 8, 1922. The facts sustained by the evidence will appear in course of this opinion.

The Wash Gray was a small tug designed for inland waters, 87½ feet long, 19 feet beam, with 9 feet depth of hold, and of 105 tons. She was insured specially for this sea voyage to be towed by a particular ship, the Freeport Sulphur No. 1, which was in regular trade on the Gulf of Mexico, and measured 309 feet long, 45 feet beam, with 22½ feet depth, and of approximately 3,000 tons displacement.

Because of the Wash Gray's size, type, and the open sea voyage intended, the insurance risk was unusual, and therefore, when application was made for insurance, the underwriters required an inspection for seaworthiness, general fitness, and towing arrangements for that voyage. For the purpose two marine surveyors, representing various underwriters, made a thorough critical inspection, followed by recommendations for certain overhauling, particularly of her towing-bitts and decking, for the planking up

of doors, ports, windows, and other openings, for her pumps, and also for her complement of men. They formally reported to the underwriters that these requirements had been complied with, certified her seaworthiness, and particularly her fitness for the particular voyage contemplated. Further, because of the extrahazardous risk involved in the transit of this small inland vessel in tow at sea, the premiums were rated up considerably by the underwriters. These varied, in the different policies, between 1½ to 2⅛ per cent.

The Wash Gray's fresh-water and fuel tanks were filled and were sufficient to sustain her for at least one week, whereas the voyage of some 420 miles ordinarily was possible in say some 45 or 50 hours. She left Tampico some 300 feet astern of the steamship towing her on a new 8-inch hawser made fast to her forward bitts, paid out double, on the evening of June 6, 1922. The weather was fair and the sea calm. She followed nicely, handled well, and so continued in tow through that evening and night and through the next day, making some 9 miles per hour with no straining or difficulty. Ordinarily, under her own power, she was good for from 10 to 12 miles per hour.

During the evening of June 7 came a fresh to strong northeasterly breeze. Later the weather grew squally, until about 8 o'clock, when the wind reached some 25 miles, with occasional puffs or gusts of greater velocity. Because of these and a cross-current and swell, the sea grew choppy, with waves running up 4 to 5 feet from trough to crest, and sufficient to break over her head.

As night wore on, the rough weather and choppy seas put a strain on the little vessel. She had up all steam necessary to work her pumps. The mate was sent below and in a few minutes reported to the captain that the forward bitts had worked loose, that her seams were opening, and she was taking water rapidly. The pounding and straining continued until she made more water than her pumps could discharge. At about 11 o'clock, the tug and tow being then little more than 100 miles from Freeport, Tex., or three-fourths of the voyage complete, the captain signaled by a red light to the towing ship ahead to stop. The water in the tug had rolled forward, thus bringing her head down. At this juncture the lines were cut. As soon as the line was cut, her head came up and the boat righted herself. In about 15 minutes the Freeport Sulphur No. 1 came alongside and stood by. Its master was then notified that the tug could stand

no more pulling. Notwithstanding the pumps were continued working, the water kept gaining on them, until, at about 2:45 a. m., the captain and crew of the tug asked to be taken aboard the ship for safety. The latter then stood by until daylight, when the master sent his engineer, mate, and some six men on board the tug to attempt saving her. They found plenty of fuel, but no fresh water in the boiler. They got up fire, filled the boiler by a hose from the ship, whilst the hand pumps were kept working, but the accumulating water put the fire out before steam could be got up. They were thus compelled to abandon further effort. Retaking his men aboard ship, the tug was made fast in tow, at about 10 a. m. of June 8, proceeding at the very slow speed of about one mile per hour. At about 10:30 a. m., the tug began to sink slowly, whereupon the ship came to a standstill, and as the tug went down the hawser was ordered out, at about 11:20 a. m.

Upon demand being made for the insurance and the submission of proofs of loss, several of the underwriters denied liability on the ground of unseaworthiness.

For convenience, the following excerpts are quoted from the policies of marine insurance:

"It is the intent of this insurance company by this policy to fully indemnify the insured * * * against the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters as above named. * * * Excepting always all claims arising from or caused by the following or other legally excluded causes, viz.: * * * From rottenness, inherent defects and other unseaworthiness. * * * And it is understood that no loss is to be paid arising from any negligence in not keeping the vessel well pumped out excepting in case of accident. * * * "

"Warranted by the insured that the said vessel shall at all times during the continuance of this policy, be tight and well found in anchors, cable, rigging, tackle and apparel, as is usual and customary, also in all other things and means necessary and proper for safe navigation according to the usage and custom. * * * "

By rider and rubber-stamp clauses variously attached or inserted in the policies: "Any agreement, contract or act, past or future, positive or implied, by the Insured whereby any right of recovery of the insured against any vessel, person or corporation is released, decreased, transferred or lost, which would, on acceptance of abandonment

or payment of loss by this Company, belong to' this Company but for such agreement, contract or act, shall render this policy null and void as to the amount of any such loss or damage, but the Company's right to retain or recover the full premium shall not be affected."

Libelant's contention is that the loss of the tug Wash Gray, under these policies, was by a peril insured against, viz., a peril of the sea, quoting definitions from Joyce on Insurance, vol. 4, par. 2797, as being all-inclusive of all damages to which marine adventure is subject, and citing Klein v. Globe & Rutgers Fire Insurance Co. (C. C. A.) 2 F. · (2d) 137, wherein District Judge Gibson was quoted and affirmed on appeal. He refused to accept the literal definitions because of the variations between the underlying facts in the case before him and these in the cited cases where definitions are given. He said:

"In arriving at the meaning of the terms in the present policy, we must keep in mind the kind of boat insured, the voyage contemplated, and the nature of the risk assumed. The Tornado was an upper river steamboat, which, under the terms of the policy, was to be towed over the Mississippi below New Orleans and a part of the Gulf of Mexico, waters which it was not designed to regularly traverse. * * *, .

"Under the circumstances it cannot be claimed that the libelant impliedly warranted the boat as seaworthy to the extent of being able to withstand all winds and waves in the lower river and the Gulf of Mexico, except such as were extraordinary.

" * * * The implied warranty of libelant was that the boat was seaworthy to the extent of being able to withstand all ordinary perils of navigation upon the upper river, and the 'perils of the seas' against which it was insured were such perils as would be extraordinary to a boat of its type."

The contrary contentions by respondent are:

(1) That the loss was not caused by any peril insured against;

(2) That the tug was not seaworthy, and therefore the risk never attached;

(3) That the release of liability contained in the contract of towage was a fact material to the risk which was concealed from and not disclosed to or known by the underwriters, and the policies were therefore avoided;

(4) That the tug was negligently towed at too great a rate of speed, proximately causing the loss, and that no recovery can be had because any right of recovery which

the underwriters may have had was released by the contract of towage.

The general consideration presented by these issues turns upon the character of the contract sued upon. In the case of Peters v. Warren Ins. Co., 14 Pet. 99–109 (10 L. Ed. 371), cited by libelant, the Supreme Court said: "If there be any commercial contract which, more than any other, requires the application of sound common sense and practical reasoning in the exposition of it, and in the uniformity of the application of rules to it, it is certainly a policy of insurance; for it deals with the business * * * of common men, who are unused to deal with abstractions and refined distinctions." [1] And the general rule is that insurance policies shall be liberally interpreted in favor of the assured, and that doubtful provisions are to be construed against the insurer. Liverpool, London & Globe Ins. Co. v. Mc-Neill, 89 F. 137, 32 C. C. A. 179, citing 1 . Woods, Ins. § 58; National Bank v. Ins. Co., 95 U. S. 673, 24 L. Ed. 563; Grace v. Ins. Co., 109 U. S. 278–282, 3 S. Ct. 207, 27 L. Ed. 932.

[2–4] Taking up the contentions made as stated, the first makes direct issue with the libelant's contention as to the meaning of the term "peril of the sea." Upon this point I am fully persuaded by the carefully considered opinion in the Tornado Case, cited and briefly quoted supra, and conclude that the implied warranty of the contract was that the Wash Gray was a seaworthy inland water vessel, and was able to withstand all ordinary perils of navigation upon such water, and the perils of the sea against which it was insured were such perils as would be extraordinary to a boat of its size and type. In my opinion this is fortified by the fact that nearly three-fourths of the voyage contemplated by the contract had been concluded in ordinary, and some of it in extraordinary, weather and sea conditions before there was any detriment or suggested danger; that the weather condition after 8 p. m., on June 7, the second night out, when the evidence clearly shows the wind attained a velocity of 25 miles an hour, punctuated with puffs of greater velocity, and the sea was choppy with waves running approximately four or five feet high. This, for a vessel of its size and type, was an extraordinary condition, amounting, under the circumstances, to such peril of the sea as the contract contemplated. The entry on the log of June 7 of the big seagoing ship Freeport Sulphur No. 1 showing, "Light E. wind, small swell; frequent showers," marked in the left margin 8 p. m.,

preceded by an untimed entry, "Light east-breeze, and squally small swell," is the only weather entry contained therein during that night or the next morning before 11:12 a. m., when the entry of the sinking appears, timed at 11:12 a. m. The log upon this point is inconclusive, to say the least. But considering it in the light of the testimony, I am convinced that, even if the entry could be assumed to mean a continuing condition, on the theory that no entry would have been made until the next change of weather condition, which is, of course, not the case, because the logbook shows unmistakably that the entries are penciled rather capriciously, irregularly, and altogether unreliably. But, I repeat, even if so construed, the terms used would have to be considered as purely relative. What amounts to a light breeze, or a small swell, or a choppy sea, as logged for a large ocean-going steel vessel would be relatively, if logged for a little inland wooden tug, with two or three feet of freeboard, an extremely dangerous gale and rough sea. The first would ride comfortably, safely, and easily, while the other would toss and pound furiously, strain her timbers, lose the caulking of her butts and seams, and so contrast the comparative calm for one to the comparative fury for the other. The oral testimony, however, makes such speculation and refinement unnecessary, since it convincingly shows that for the Wash Gray, in the open Gulf, the wind and the condition of the sea were extremely perilous; that both the towing ship, its officers and crew, and the crew of the little tug omitted nothing that good seamanship, skill, and prudence would dictate. When the bitts were found to be loosed from the straining and pounding of the little vessel, a Spanish windlass was rigged to brace them back in place, the pumps, both hand and steam, were worked full power and time in an effort to discharge the water pouring in her open seams; that the proximate and efficient cause of the sinking and loss was due to the extraordinary condition of weather and sea, the unusual peril, irresistible force, or overwhelming power, constituting the peril insured against by the contract. Upon this point the libelant has amply sustained the burden of proof.

[5] The second contention as to seaworthiness is in no better case. Libelant's case, upon this point, does not depend entirely on the fact that, as a condition precedent to the underwriting, the insurers required and obtained inspections, detailed recommendations of two expert marine surveyors, and a certificate of compliance with all require-ments deemed by them necessary to show that the Wash Gray was seaworthy and fit, equipped and appareled with a view to the particular voyage, in tow of the particular ship to Freeport, to be thence towed by another approved by them to Galveston, for the specific, known purpose of general overhauling and changing of her engines. There is, additionally, the oral testimony which clearly shows that these surveyors were correct in their report and had competently functioned in making their recommendations and accepting the compliance by the owner, as per their certificate. The unwarranted assumption that the Wash Gray pulled apart, upon which the contrary is argued in the brief of respondents, is not sustained by the evidence. She did not pull apart in any particular. It is conclusively shown, and uncontradicted, that her forward bitts pulled loose because of the extraordinary straining and pounding under the stress of weather encountered. This was overcome, as the evidence shows, by the rigging of the Spanish windlass. The water which caused the sinking was shipped through her seams, from which the caulking had worked by the same cause. The only hope of overcoming this was by pumping, but pumping was inadequate. There is no evidence to show that this water leaked or entered the hull in any other way. While there is satisfactory evidence that the seas broke over the head of the little vessel, yet all the windows, doors, ports, and other openings were planked or otherwise shut and made fast, except for one upper side entrance, through which the men climbed down into the boiler room. Several others were opened after the vessel was in actual danger to afford a means of saving the lives of the men as they made their last effort to save her after the towing stopped at about 11 p. m. The argument that the doctrine of res ipsa loquitur should be applied, predicated on the erroneous and unwarranted assumption that the Wash Gray pulled apart, is without merit. It would indeed seem proper to apply it to the contrary. The fact that the little vessel followed the ship well on the towing hauser and handled well through the evening and night of June 6, through the day and part of the night of June 7, when the weather became disturbed, and up to about 10 o'clock of that day, and then, though helpless, remained afloat intact and did not go down until after 11 o'clock of June 8, having gone something more than 300 miles of a trip little more than 400 miles, speaks eloquently for a vessel of its size and type. Cases cited by respond-

ents, where seagoing vessels encountered gales not extraordinarily terrific, are eliminated from consideration upon the principle applied in the Tornado case.

The third and fourth contentions, predicated (1) upon the alleged release of liability clause in the contract of towage, i. e., that it was a fact material to the risk, unknown to and not disclosed to the underwriters, for which the policies were avoided; and (2) that the tug Wash Gray was negligently towed at too great speed, and that underwriters lost a right of recovery because of that release, may be considered together.

The release of liability in the towage contract was: "Freeport Sulphur No. 1 will furnish hawser, all other risk and expense to be borne by the tug. It is understood you will keep sufficient men on board to keep up steam and man the tug's pumps. S. S. Freeport No. 1 is not responsible in any way for loss or. damage to the Wash Gray."

The rider-release clause of the policy is quoted in full as an excerpt therefrom supra.

[6, 7] A fair resolution of the evidence is in favor of libelant upon this feature of the case. A number of witnesses, familiar with towage contracts, having knowledge of the custom and practice from experience, testify that such clauses are usual and common, particularly in outside towage contracts between points on the Gulf of Mexico; that the tow carries its own risk always; that the tug never assumes the risk or hazard of loss or damage to the tow. Summed up, the conclusion upon it is that the tug undertakes no risk or hazard for the safety of the tow; or, in other words, that the tug is not the insurer of the safety of the tow. Can it be said that the clause complained of discharges the tug of its liability for any damage resulting from negligence or from its failure to exercise the due care and caution required of it by law? Clearly there is no declaration in this clause indicating a release such as would deprive the tow of its ordinary right of action for any damages it might have for negligent acts of omission or commission by the Freeport Sulphur No. 1. The evidence satisfies me that such releases are very common, if not general, in towage contracts such as that under consideration; that the underwriters knew it, and if any did not, it was their business to know it. They did not inquire for a view of the contract. It is not clear that their brokers and agents did not know of the very terms of the towage contract, since it was stipulated as a condition precedent to the underwriting that the specific steamship Freeport Sulphur No. 1 and another later to be selected and approved by them or their agents was to do the towing, and all other specifications were minutely detailed for that operation at their behest. It is well settled as a matter of law that every contract of insurance is presumed to be made with knowledge of the customs and practices of the trade in which the insurance is made. Renner v. Bank of Columbia, 22 U. S. (9 Wheat.) 581, 589, 6 L. Ed. 166.

[8, 9] Under the circumstances, if it were a fact that the loss or damage resulted from the negligence of the Freeport Sulphur No. 1, such negligence being actionable, there is nothing in the release clause of the towage contract which might defeat such a cause of action. By its terms it does not pretend to release liability for loss or damage growing out of the tower's negligence. Such an intention would be defeated by the very obscurity of its terms. Such an agreement to release liability would have to be clearly established before a court would give effect to it. The Defender (D. C.) 208 F. 836. Whilst the policy of the law has not imposed on the towing boat the liability of a common carrier, it does require of it the exercise of reasonable care, caution, and maritime skill. Neglect of these, resulting in loss, damage, or disaster is actionable. The Syracuse, 79 U. S. (12 Wall.) 167, 20 L. Ed. 382. As no right of action existed in favor of libelant, independent of the terms of the towing contract, nothing was lost or could be by respondent because of it. But, say the respondents, the tug was lost, if not because she was unseaworthy and fell apart, because, being seaworthy, she was towed at too great speed, at nine miles per hour, and was negligently pulled apart by the towing boat, because of which, except for the release clause in the towing contract, they would have a right of action for damages by subrogation.

[10] This part of the contention is practically disposed of by what has gone before. If it were true that the loss was due to such negligent towing and such a right of action had therefore accrued, it would not, or at least it is extremely doubtful that it would, be defeated by the clause complained of. This, however, is purely a moot question. The evidence discloses no such negligence. The speed of the Wash Gray under its own power was shown to have been from 10 to 12 miles per hour. She was towed at an average of about 9 miles per hour, following nicely and handling well, unstrained and unhurt for the greater part, or three-fourths,

of the voyage. The respondents, with no evidence to sustain them, argue upon a theory that this speed should have been reduced after the sea became rough. The evidence satisfied me that the master and officers of the towing ship exercised their best judgment; that the steady speed of about 9 miles became necessary to keep the tow lines taut, so as to avoid having the towed vessel sheer to one side or the other, get into the trough of a sea, be thus tripped and turned over. Opposed to this there is no evidence to show that this desirable result could have been achieved at lesser speed, or that the master of the towing vessel erred in his judgment in maintaining that speed. There is certainly nothing to justify the unwarranted assumption by respondent that the vessel was pulled apart by excessive speed in towing, upon which their theory is predicated, as hereinbefore recited.

There will therefore be a decree in each of these eleven cases for libelants, with interest and costs.