## CALZAVARO v. PLANET S. S. CORPORATION et al.

Circuit Court of Appeals, Fourth Circuit.
April 9, 1929.

No. 2797.

886

Homer L. Loomis, of New York City (Loomis & Ruebush, of New York City, and Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellant.

Horace L. Cheyney and Paul L. Clugston, both of New York City (Kelsey & Jett, of Norfolk, Va., Macklin, Brown, Lenahan & Speer, of New York City, R. Arthur Jett, Jr., of Norfolk, Va., Richard F. Lenahan and Barry, Wainwright, Thacher & Symmers, all of New York City, Baird, White & Lanning, of Norfolk, Va., John C. Prizer, of New York City, and George M. Lanning, of Norfolk, Va., on the brief), for appellees.

Before WADDILL, Circuit Judge, and McDOWELL and MEEKINS, District Judges.

McDOWELL, District Judge (after stating the facts as above). After much consideration of a very unsatisfactory mass of evidence, we have reached the conclusion that the sole responsibility for the injury to the Corvus lies on the towing company. In particular we are of opinion that the fault was on the part of the mate in charge of the tug Agnes Moran.

Tugs so powerful as to be able unaided to carry a ship from the east side to the west side of Erie Basin at a dangerous rate of speed must of necessity have been powerful enough to take the same ship unaided half that distance at a moderate rate of speed. Equally, of course, these tugs had unaided much more power than was necessary to turn the ship's head to the north.

Healey, the senior officer of the towing company, and the master of the Clam, were both on the ship's bridge when the operation was commenced and until after the collision. Healey was in command. After the master of the Clam, Scarpa, had called Healey's attention to the danger of collision with the Corvus, Healey had Scarpa telegraph a signal to the Clam's engine room for full speed ahead. However, the engines of the Clam did not respond, or did not respond quickly enough to put the ship's propeller into effective action in time to avoid the collision.

The cause for the slow action of the propeller has not been made at all clear by the evidence.

1. The cause may have been that the ship's engines as originally constructed were of such character that they could not get the

propeller into effective action soon enough to be of service in what Healey himself speaks of as an emergency. This possibility may be briefly disposed of. There can be no negligence unless there has been a breach of duty. We know of no rule of law which, in the absence of contract, made it the duty of the owner of the Clam to equip his ship with engines capable of such quick action as to be able to counteract unexpected negligence such as that of the towing company's agent, Banks. There is no evidence of any contract obligation which could possibly have made it the duty of the owner of the Clam to have originally installed better engines.

The towing company may have had an implied right to make use of the ship's engines, and to have such service as they might render. But this fact in no way created a duty on the Clam's owner to provide engines of better quality than he had provided for his own purposes.

2. The cause of the slow response may have been that the engines, originally capable of quick action, had fallen into disrepair. The reason for discussion of this supposition is that Scarpa testified that he told Healey, when Healey came aboard the Clam, that her engines "had been proved and were in order." But Healey himself knew that the Clam had been laid up, out of use, for four or five years, and he testified that he did not expect her to be in first-class condition. As Healey knew nothing about the original capacity of the engines, and as he of his knowledge did not expect them to be in first-class condition, we cannot regard Scarpa's statement as having misled Healey as to the capacity of the engines.

3. A third possible explanation is that the engineer was not at his post when the order for full steam ahead was telegraphed to him. The engineer denied this in his deposition, and there is no evidence contradictory of his evidence on this point. It is a fact that he did not in response to the order reply by telegraphic signal that full steam ahead had been put on. But the all-sufficient reason is that the engines did not respond and he had not been able to carry out the order.

■ 4. The remaining effort to show a reason for the slow action of the engines is found in some testimony given by Healey. Scarpa spoke both English and Italian, the engineer spoke only Italian, and Healey understood only English. Healey testified, over objection of counsel for the owner of the Clam, as follows: "The engineer came up on the bridge while we were still lying at anchor in the basin perhaps a couple of minutes after the collision. He spoke to the captain and I did not understand a word of the conversation. I didn't know who he was. * * * The captain told me—I said 'what is the matter?'—the engineer said a key or pin dropped out of the throttle valve and he couldn't give the ship steam. * * *"

Both Scarpa and the engineer deny the truth of the statement, but we cannot satisfactorily treat it as untrue. It may be untrue and it may not. Its materiality comes from Scarpa's statement to Healey that the Clam's engines had been proved and were in order. This statement had given Healey a right to understand that the ship's engines were at least not incapable of any service, even temporarily. However, we think the testimony in question was inadmissible. If Scarpa, master of the Clam as he was, had gone to the engine room, had seen with his own eyes that the cause of the delay was that a pin had fallen out, and had then told of his discovery to Healey, the owner of the Clam would not be bound unless making such report to Healey was within the scope of Scarpa's duties. We know of no duty resting on Scarpa to make such report, or any report, to Healey. The power of an agent to bind his principal by making an admission against the interest of the principal is not a part of the law of evidence, but a part of the substantive law of agency. And we are quite unable to say that the mere fact that Scarpa was master of the Clam gave him the authority to go outside of his duties and make admissions which would be binding on his principal. And if Scarpa had not the power so to bind the owner, the engineer even more clearly also had not such authority. And if neither the master nor the engineer had power to bind the owner, the evidence was certainly inadmissible.

■ We are also of opinion that Healey's testimony as to the statement made by Scarpa is hearsay for another reason. The engineer did not select Scarpa as interpreter. The engineer was not addressing Healey and wanted no interpreter. See Jones, Ev. (Civil Cases, 3d Ed.) § 265; 1 Wigmore, Ev. (2d Ed.) § 668.

Seemingly Scarpa's deposition had either not been taken, or at least had not been filed, at the time when Healey testified. The propriety of admitting evidence in anticipation that it will show that a statement in pais by an expected witness contradictory of what the witness may say when (and if) he testifies need not be discussed. In no event can Healey's evidence of what he says Scarpa

said be of importance, except as detracting from Scarpa's credibility. As evidence that a key or pin had been negligently allowed to drop out, or as evidence of negligence in that this fact had not been sooner discovered, the testimony of Healey was inadmissible hearsay.

There was no other evidence of any failure to act on the part of any of the engine room employees.

It follows from what has been said that the failure of the Clam's engines to get her propeller into action soon enough to avert the collision was not a breach of any duty owing by the owner of the Clam to the Corvus or to the towing company.

We must now consider an item of evidence on which counsel for the towing company lay much stress.

While the Clam was at anchor after the accident Healey wrote and had Scarpa sign the following statement:

"March 30.

"When S. S. Clam was half out of slip telegraph was full ahead; ship made no response. I dropped port anchor; S. S. Clam's stern struck S. S. Corvus laying on breakwater. No fault of tug boat pilot.

"Licinio Scarpa, Master Clam.
"W. H. Lowe, S. H. Pilot."

Scarpa testifies that the last sentence was added to the statement after he signed it. He and Healey are the only witnesses on this point and the evidence is too nearly balanced to justify us in accepting Scarpa's version as being true. However, we do not regard the sentence in question as important. It cannot possibly be read as intended to exonerate Banks, the mate of the Agnes Moran, whose negligence was the cause of the collision. Healey was the "tug boat pilot," and at the utmost he alone is referred to. Again, the sentence in question is a layman's opinion on a question of law. While Scarpa's statements of fact are deserving of attention, we do not so regard his conclusions of law.

In the writing is a statement which is clearly untrue. "When S. S. Clam was *half out of slip* telegraph was," etc. Healey himself, speaking of the Claim, testified: "I didn't attempt to use her engines until the Claim's stern was about 100 or 120 feet away from the Corvus. * * *"

In an effort on the part of Banks to check the speed he had given the Clam, the hawser from the ship to the Agnes Moran parted. This rope was supplied by the Clam, was about 6 inches in circumference, and according to Banks himself it "looked all right."

Scarpa says the rope was new and had been proven. The evidence satisfies us that the rope yielded to a strain that was more than should have been put on it, and we find no proof of negligence in the character of the rope. It was broken by Banks in a vain effort to overcome his own negligence.

There is evidence from Healey to the effect that he intended to make use of the ship's power. The undertaking of the towing company was to take the Clam into the open water outside the Erie Basin. The operation consisted of two parts. The first was to take the ship westward from the slip it was in to the center, or near the center, of the Basin, turning her head there, or on the way there, so as to point about north. The second part of the undertaking was to tow the ship about 1,800 or 2,000 feet through the middle of the basin and out into the open channel. That Healey expected to use the ship's power in executing the second part of his undertaking is probable. That he expected to use the ship's power to overcome a dangerous and reckless action on the part of Banks, in executing the first part of the undertaking, is improbable. But, even if so, he did not advise Scarpa of such expectation. Scarpa, so far as appears, had no reason to anticipate Bank's act, and hence cannot possibly be supposed to have made any representation, or to have given any assurance, at all as to the capacity of the Clam's engines to give emergency service, such as would have been necessary to overcome the speed given the Clam by Banks.

At the time the towing company was engaged by the Columbus Marine Corporation, the agent of the Clam, the towing company had on a printed card containing its schedule of rates the following: "When the Captain of any tug engaged in the service of assisting a vessel which is making use of her own propelling power goes on board said vessel or any other licensed pilot goes on board said vessel, it is understood and agreed that said tugboat captain or any other licensed pilot becomes a servant of the owners in respect to the giving of orders to any of the tugs engaged in the assisting service and in respect to the handling of said vessel and neither the tug or their owners or agents shall be liable for any damage resulting therefrom."

There are several reasons for rejecting the contention that the foregoing relieved the towing company, and put on the owner of the Clam, the liability for Banks' negligent act: It does not appear from the evidence that the Clam's agent knew of the existence of the provision in question when the con-

tract was made. The undisputed evidence affirmatively shows that the tugs were engaged to take the Clam out of the Erie Basin, and were not engaged to assist her to get out. The Clam's own propelling power had not been used at the the time the accident occurred. This provision in question refers to Healey and in no way to Banks, and the cause of the injury was a reckless act on the part of Banks, which had not been ordered by Healey.

It follows that it is unnecessary to express an opinion as to the validity of a contract intended to excuse a towing company from the negligence of its own employees. See The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382; the Sea Lion (D. C.) 12 F.(2d) 124.

We are of opinion to reverse and hold the towing company solely responsible. The costs in this court of the owner and of the charterer of the Corvus, and the costs of the owner of the Clam, to be taxed against the towing company.

Reversed.