## THE VULCAN.

### RIVERSIDE TRAWLING CO., Inc., v. THE VULCAN et al.

### RIVERSIDE PACKING CO., Inc., v. SAME.

Nos. 624, 625.

District Court, E. D. Louisiana,
New Orleans Division.

April 7, 1945.

Richard B. Montgomery, Jr., of New Orleans, La., for libelant.

John D., M. A. & Edwin H. Grace, of New Orleans, La., for Sabine Towing Co., Inc.

Lemle, Moreno & Lemle, of New Orleans, La., for River Terminals Corporation.

BORAH, District Judge.

On the afternoon of December 5, 1942 the fishing boats, Racketeer and Gertrude, were moored alongside the wharf of the Riverside Packing Company, Inc., at Berwick, Louisiana. This wharf is located on the west side of Berwick Bay immediately south of the Southern Pacific Railroad bridge. The Gertrude was moored higher upstream partly protected by the west fender of the draw which lay on her starboard hand and the Racketeer was moored immediately behind her.

At this time the tug Vulcan, with barges 93, 44 and 91, owned by the River Terminals Corporation, in tow, was proceeding up the Atchafalaya River bound on a voy-

age to Baton Rouge, Louisiana. Before rounding a bend in the river which screened the bridge from view and when within about one mile of the bridge, the mate, who was then at the wheel of the tug, signaled for a passage through the bridge and received an all-clear signal in response. On reaching a point within three-quarters of a mile from the Southern Pacific Company's bridge across Berwick Bay connecting Berwick and Morgan City, the speed of the tug was reduced to slow or about two and a half miles per hour. Under a slow bell with the current running at the rate of about two and a half miles an hour and with a strong wind out of the southwest, the tug proceeded on a general northerly course and came within sight of both of the bridge spans when the latter were about 1200 or 1500 feet away. When the bridge came into view the tug was lined up to pass through the east span, which is on the Morgan City side of the bridge, but the mate and the master, who was standing on the bridge nearby, observed that a pile driver and some barges were blocking its passage. When about 1500 or 1600 feet distant from the bridge they received a warning that the east span was closed to navigation when one of the bridge tenders out on the center span signaled them to pass through the west span. Upon receipt of this warning the tug changed course and headed for the west span.

The master of the Vulcan described the maneuvering of the tug and tow in this fashion: "Well, the current was running in, as I say, and when I swung up to the left, that threw a swing in my barges, putting the current on the left hand side of the tow. Naturally that sent them down a little, and when I swung into the bridge, the middle barge struck the center pier of the bridge. I was going at slow speed when the barge struck the bridge. Then I rang for full speed, to pull them on through, and the line parted between the lead barge and the second barge. I went on through with the lead barge and the other two barges glanced on and struck this fishing boat on the left hand side."

At this juncture we encounter a variance between the verified answers of the Sabine Towing Company, Inc., and the testimony of the master of the tug. The answers set forth that the "rubbing" of the second barge against the bridge fender was accidental. The master's testimony, however, is that the "rubbing" was intentional. Other inconsistencies will be adverted to later on.

There is no controversy here as to what happened to the two barges after they had broken loose from the lead barge. It is conceded by all that they swung over to the west bank and crashed into the Gertrude and Racketeer with great force, causing each vessel to sink.

As a result of this collision two separate libels were filed against the tug Vulcan and the River Terminals Corporation barges 93, 44 and 91, one libel being instituted by the Riverside Trawling Company, Inc., the owner of the Gertrude, and the other by the Riverside Packing Company, Inc., the owner of the Racketeer. The River Terminals Corporation, as the owner of the barges 93, 44, and 91, and the Sabine Towing Company, Inc., as the owner of the tug Vulcan, appeared separately in each case claiming their respective vessels and each separately posted release bonds. Thereafter the River Terminals Corporation filed petitions under the 56th Admiralty Rule, 28 U.S.C.A. following section 723, against the Sabine Towing Company, and the latter filed similar petitions against the former. By stipulation of the parties it was agreed that these cases should be consolidated for trial insofar as the question of liability is concerned, separate decrees to be rendered in each case. The questions for decision are: Whether the libelants are entitled to recover their damage or any part thereof for the sinking of the two fishing boats which they own; and if so, what is the liability therefor between the Sabine Towing Company as the owner of the tug Vulcan and the River Terminals Corporation as owner of the three barges.

Too well settled to require extended citation of authorities is the principle of admiralty that in a collision between a moving vessel and a vessel moored in a proper place there is a presumption of negligence on the part of the moving ship. The Waterford, 2 Cir., 6 F.2d 980, 981.

In the instant case the libels allege that the Gertrude and the Racketeer were moored to the dock where they had a right to be at the time of the collision. On the other hand, the respondent claimant asserts that these two vessels were moored "in an improper and unsafe place, and unnecessarily and negligently exposed to danger, * * * and should take the consequences of said collision." There was evi-

dence introduced to the effect that the owners of the two fishing boats "had no official license for a wharf at the particular point at which these boats were moored." However, the president and general manager of the two Riverside companies testified that they had been operating their vessels from that wharf since 1935, and that, prior to that time, the Norman Breaud Lumber Company, from which the wharf was purchased, had done likewise.

■ Assuming without deciding that the wharf was not authorized by law and that the Gertrude and Racketeer were illegally moored thereto, it does not follow that libelants are ipso facto barred from recovering damages. Under the authorities it is plain that libelants may be permitted to show that the existence of the unauthorized wharf not merely might not have been one of the causes of the collision or that it probably was not, but that it could not have been. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726.

■ In my opinion libelants have discharged this burden. In its answers the Sabine Towing Company, Inc., alleges that "the collision * * * was occasioned solely as a result of the breaking of the couplings * * * for which claimant denies liability * * *" And this allegation finds support in the testimony of the master. It follows therefore that if the parting of the ropes was the sole cause of the accident, the allegedly illegal mooring of the fishing boats could not have been one of the causes. It is not necessary, however, to base this conclusion solely upon these admissions. The entire record shows the parting of the coupling lines and the subsequent collision were caused by the negligent manner in which the tug Vulcan was handled.

The evidence in this case is all one way and to the effect that it was the port coupling line between the lead barge and barge No. 2 that broke first, and all of the witnesses on the tug testified that the line did not break until the engine on the tug had been put full speed ahead. Now what happened and the reason for its happening is obvious. When barge No. 2 came to rest against the bridge fender approximately amidship of the barge and the tug was put full speed ahead this pulled the lead barge to the right putting the starboard after corner of No. 1 barge against the forward starboard corner of No. 2 and placed the entire strain on the coupling line between the after port corner of barge No. 1 and the forward port corner of No. 2 barge. There was therefore on the port coupling line between No. 1 and No. 2 barges all of the strain of the pull of the tug, the weight of No. 1 barge, all of the force exerted on the No. 1 barge by the current and also the weight of No. 3 barge plus the force of the current on the No. 3 barge. The pull of the tug, the weight of the loaded oil barges and the force of the current put an inordinate strain upon the coupling lines. It was never intended that any such strain should be put on those coupling lines, and the fact that the port coupling line parted and that the entire pull was put on the starboard coupling line causing it to break does not under these circumstances raise any presumption that they were unfit for use as coupling lines under normal conditions.

If the master's testimony that he intentionally permitted the second barge to strike the fender is accepted, it follows that he was further negligent, for the "Rules and Regulations to Govern the Use, Administration and Navigation of all Waterways Tributary to the Gulf of Mexico (except the Mississippi River and its tributaries), from St. Marks, Florida, to the Rio Grande," Section 5, Subsections c and d, provide "That tows designed to pass a bridge shall approach the opening along the axis of the channel so as to pass through without danger of striking the bridge or fenders. * * *"

The tug owners seek to justify its maneuvering on approaching and passing through the bridge on the ground that those in charge of her navigation did not know that the east span was closed until it was too late to turn around and take the tow back down the river. I cannot agree. The master of the tug knew that the mate had come through the west span of the bridge several days before on the Trojan and he had been told that the east span was then closed. If those in charge of the navigation of the tug did not actually know that the east span was closed to navigation they at least had knowledge of facts sufficient in themselves to place a prudent navigator on notice that there was a likelihood that the east span would be closed and that he should approach the bridge with his tug and tow under control and be prepared to line them up to pass through either span. This they

did not do; and, failing in this, they also neglected to take into account the known existing conditions of wind and tide. The coupling lines were broken in a vain effort to overcome the master's own negligence, and I am convinced from the evidence that the coupling lines yielded to a strain that was more than should have been put upon them.

Immediately after the accident the master of the Vulcan furnished the Coast Guard with a written statement in which to the extent here pertinent he described the accident in this language:

"While approaching Southern Pacific Bridge at Morgan City from down stream with a strong southwest wind and strong flood tide, tow sheared to the left causing barges to strike center approach on bridge, breaking tow lines on lead barge causing two stern barges to go into two fishing boats on west bank of river, sinking both of them, one being the Gertrude and the other the Racketeer, also damaging approach to bridge slightly. * * *"

According to this statement the tow-lines parted as a result of the barges coming into contact with the bridge. Thus again the evidence shows that the parting of the tow lines was the sole cause of the accident.

The towage agreement between the claimant tug company and the River Terminals Corporation provided that the latter should "furnish connecting or coupling lines", and that the former was to act "solely as an independent contractor" and was to "have exclusive control in every particular of the method and manner of performing the towage operations". Under the terms of the foregoing provisions the Sabine Towing Company maintains that the River Terminals Corporation is chargeable for any responsibility that may attach as a result of the parting of the coupling lines and the consequent collision. The River Terminals Corporation, on the other hand, insists that since the Sabine Towing Company had exclusive control over the towage operations, it had the duty to reject the barge company's ropes if they were defective, which the River Terminals Corporation denies, and the further duty to furnish its own lines, charging the River Terminals Corporation for the expense.

■ It is well recognized in admiralty that, if a hawser is subject to an extraordinary strain because of a sudden maneuvering made necessary by the prior negligence of the master of the tugboat, the latter is responsible for the resulting parting of the coupling lines and the consequent collision. City of Philadelphia v. Gavagnin, 3 Cir., 62 F. 617, 618; The Edmund Moran, 2 Cir., 180 F. 700, 701–702; Calzavaro v. Planet S. S. Corporation et al., 4 Cir., 31 F.2d 885, 888.

This responsibility for the parting of a hawser occasioned by a maneuver that in turn is made necessary by the tug master's prior negligence has been recognized even in cases where the hawser is furnished by the tow. The Alpha, 27 F. 759, 761. See also Calzavaro v. Planet S. S. Corporation et al., supra.

■ Similarly, it has been repeatedly held that it is the tug master's duty to inspect hawsers before starting out on a trip, whether they are furnished by tug or tow. In The Quickstep, 9 Wall. 665, 76 U.S. 665, 671, 19 L.Ed. 767, the court said:

"It was the duty of the tug, as the captains of the canal-boats had no voice in making up the tow, to see that it was properly constructed, and *that the lines were sufficient and securely fastened. This was an equal duty, whether she furnished the lines to the boats, or the boats to her.* In the nature of the employment, her officers could tell better than the men on the boats what sort of line was required to secure the boats together, and to keep them in their positions. If she failed in this duty she was guilty of a maritime fault." (Emphasis supplied)

In the instant case there were no crewmen aboard the barges. A fortiori, the rule announced in The Quickstep should apply. Again, in The Margaret, 94 U.S. 494, 495, 496, 24 L.Ed. 146, when a tug was about to take on a tow, "the linesman on the tug called for a line, and it was handed to him over the starboard bow." The tow, a brig, was grounded on a bar. In the maneuvering that followed, first the port line and then the starboard line broke. The court said: "If the port line was too weak, the tug should have called attention to it. Silence was a fault."

The master of the Vulcan testified that following the accident his crew took what it "could salvage of those lines, spliced them together, and made up the tow" and that the Vulcan then proceeded to Baton Rouge, where he arranged for the obtaining of two additional lines. The evidence

shows that the vice president of the River Terminals Corporation started an investigation to find the broken coupling lines, asking its proctor to get in touch with the tug company's proctor "and have him ask his client to endeavor to help * * * to get the lines". The lines have never been found, according to this witness, and his testimony stands uncontradicted.

In other words, the parted coupling lines were last in the possession of the respondent tug company, which has not produced them. This failure to come forward with the best evidence as to the damaged ropes gives rise to the presumption that the lines, if produced, would constitute mute evidence unfavorable to the tug company. In Interstate Circuit v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, the court said:

"The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Clifton v. United States, 4 How. 242, 247, 11 L.Ed. 957. Silence then becomes evidence of the most convincing character." (Many cases cited).

This doctrine has been adopted in this circuit and has been applied in a rope case. In Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 72 F.2d 44, 46, the court used this language:

"We think it cannot be doubted that the failure to produce the rope was a matter for the serious consideration of the District Judge, and that it is to be considered by us in connection with all the other evidence, in reaching our conclusion whether the decree must be reversed."

In its answer the tug company alleges that "while said lines were dirty and oily and appeared to have had considerable prior use, in the opinion of the master of the tug Vulcan, and from his many years of experience in towing, said coupling lines appeared to be good and sufficient for the use to which they were to be put * * *" Since the testimony is undisputed that coupling lines were not used by the Vulcan for more than two or three trips, it might well be argued that the master was negligent in using lines so unpropitious in appearance.

The tug company is confronted with this situation: Either the lines showed evidence of "considerable" prior use and the Vulcan's master was negligent in using them without having first subjected them to a more careful examination; or the lines were sound and staunch, and parted only because of the extraordinary strain to which they were subjected as a result of the Vulcan's negligent maneuvering. This record in my opinion fully supports the latter conclusion.

I am persuaded that the fault of the collision lies solely with the claimant tug company and that the two barges were but passive instrumentalities in the hands of the tug. Where as here the tugboat supplying the power is in control and the tow inert and helpless, the towing vessel alone is liable for fault and errors in navigation. Sturgis v. Boyer, 24 How. 110, 16 L.Ed. 591; The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600; The Liverpool etc. Navigation Co. v. The Brooklyn Terminal, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130.

It follows that the libels should be dismissed as to the barges and their claimant, River Terminals Corporation; that the petitions filed by the Sabine Towing Company against River Terminals Corporation should likewise be dismissed, and that the Riverside Trawling Company and the Riverside Packing Company are each entitled to a decree against the tug Vulcan and her claimant, the Sabine Towing Company, for full damages and a reference to compute the amount.